**Robert VOGEL, Sam Vogel, Dr. John McCracken, John Mazarra and Alan B. Werner, Plaintiffs,**

v.

**SANDS BROS. & CO., LTD., Defendant.**

**No. 98 Civ. 2527 BDP.**

United States District Court, S.D. New York.

Jan. 4, 2001.

Jill Rosell, Thomas M. Skelton, Lowey Dannenbeg Bemporad & Selinger, White Plains, NY, for plaintiffs.

Walter C. Carlson, R. Rene Pengra, Sidley & Austin, Chicago, IL, for defendant Conseco.

Richard A. Roth, Ira Meyerwitz, Littman Krooks Roth & Ball P.C., New York City, for defendant Sands Bros.

## MEMORANDUM DECISION AND ORDER

BARRINGTON D. PARKER, Jr., District Judge.

By Memorandum Decision and Order dated March 30, 1999, this Court dismissed the original complaint (the "Complaint") filed by lead plaintiff David Schnell on behalf of a purported class of public investors in NAL Financial Group, Inc. ("NALF"). *See Schnell v. Conseco*, 43 F.Supp.2d 438 (S.D.N.Y.1999). The Complaint alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, against Conseco, Inc. ("Conseco"), and violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder by the Securities Exchange Commission (the "SEC"), 17 C.F.R. § 240.10b–5, against Sands Brothers & Co., Ltd. ("Sands").

The RICO claim against Conseco was dismissed with prejudice because plaintiff failed to adequately allege a scheme to defraud, a pattern of racketeering activity or causation. The § 10(b) and Rule 10b–5 claims were dismissed against Sands without prejudice because the Complaint failed to satisfy the heightened pleading standards set forth under the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u–4(b) for alleging misrepresentations and omissions, and because it failed to adequately allege scienter. This Court granted leave to amend the Complaint against Sands.

On April 29, 1999, lead plaintiffs Robert Vogel, Sam Vogel, Dr. John McCracken, John Mazarra and Alan B. Werner,[1] on

---

1. On June 28, 1998, following motions made, Robert Vogel, Same Vogel, Dr. John McCracken, John Mazzara and Alan B. Wer-

behalf of the same purported class of investors of NALF, filed an amended complaint (the "Amended Complaint") against Sands. The Amended Complaint again alleges violations of § 10(b) of the Exchange Act and Rule 10b–5.[2] Before this Court is defendant's motion to dismiss under Fed. R.Civ.P. 12(b)(6) and 9(b). For the reasons stated below, defendant's motion is granted.

## BACKGROUND

Many of the facts relevant to this dispute are set forth in this Court's prior decision, with which familiarity is assumed. *See Schnell,* 43 F.Supp.2d at 438. For purposes of deciding this motion, the Court is obligated to construe the pleadings in favor of the plaintiffs, and must accept as true all factual allegations made in the Amended Complaint. *See Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998); *Serrano v. 900 5th Avenue Corp.,* 4 F.Supp.2d 315, 316 (S.D.N.Y.1998). All reasonable inferences must be made in plaintiffs' favor. *In re Blech Securities Litigation,* 961 F.Supp. 569, 579 (S.D.N.Y. 1997) (citing *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994)). The following facts are construed accordingly.

Conseco is an Indiana based financial services holding company, engaged in the development, marketing and administration of annuity, supplemental health and individual life insurance products. Sands is an investment banking firm, a broker and dealer in securities registered with the SEC, a member firm of the New York Stock Exchange and of the National Association of Securities Dealers ("NASD"). Conseco is alleged to be Sands' most valued client, and certain executive officers of Conseco are claimed to share a long-lasting relationship with Sands' co-founders, Martin and Steven Sands, spanning over fourteen years.

NALF is a Delaware corporation founded in 1991. It is engaged in the purchase and servicing of automobile loan and lease contracts. One year after becoming a public company on November 30, 1994, NALF began securitizing its loan portfolios whereby it would periodically sell an asset pool of various loan contracts to a trust. In turn, the trust would pay NALF with proceeds raised by issuing securities to investors in the form of notes and certificates backed by the assets of the trust. NALF collected payments due on the loan contracts, receiving an annual servicing fee equal to 3% of the principal of the outstanding loans.

The collections of interest and principal on the loan contracts were used to pay interest and principal due on the securities issued by the trust. Any payments in excess of those needed to service the securities and to pay other fees and expenses of the trust were deposited into a reserve account to the extent necessary to maintain a prescribed operating level. Any remaining cash was paid directly to NALF. The gains on the sale of the loan contracts under this securitization program enabled NALF to record significantly increased revenues in each of the quarters during which a securitization was completed.

NALF's stock price remained steady throughout most of 1996, peaking at over $16 per share. From late 1996, however, NALF's stock started to decline, particularly after a February 1997 announcement of reserve deficiencies deemed to be attributable to weak underwriting guidelines in the loan contracts from December 1995 through March 1996. On March 23, 1998,

---

ner were added as plaintiffs by Order of this Court. They adopted the original pleading.

**2.** On December 9, 1999, this Court denied plaintiffs' motion for leave to file a Second Amended Complaint to assert securities fraud claims against both Conseco and Sands, and the motion of Richard Scherrill to intervene as a plaintiff in a newly proposed class action. *See Vogel v. Conseco,* No. 98 Civ. 2527, slip op. at 3–6 (S.D.N.Y. Dec. 9, 1999).

NALF filed for protection pursuant to Chapter 11 of the bankruptcy laws. No claims are asserted in this action against NALF.

The gravamen of the Amended Complaint revolves around plaintiffs' theory that Conseco devised and successfully implemented a scheme to take control over NALF at the expense of its public investors. Specifically, plaintiffs allege that Conseco intended to, and did, make a nominal investment in below-market convertible debt securities of NALF. Plaintiffs allege that the purpose of these investments was to obtain effective control over NALF through "arrangements" made with its corporate insiders and controlling shareholders, to permit those insiders and controlling shareholders to cash out their investments at a profit by artificially inflating the value of NALF's stock, and to cause NALF to conduct quarterly securitizations until its financial statements were in a position to support a public offering. Plaintiffs further allege that Conseco improperly schemed to use the proceeds of the public offering to continue the securitization program until the conversion date of the debt securities, to artificially depress the stock price of NALF after the offering to permit Conseco to convert the debt securities at a market discount, and finally to force NALF into a pre-packaged bankruptcy reorganization. *See* Amended Complaint at ¶ 4.

According to plaintiffs, Sands helped further Conseco's scheme by making material misrepresentations and omissions about NALF's business, and by using its market-making ability to manipulate NALF's stock prices in ways favorable to Conseco's purported scheme.

Plaintiffs support their theory with the following factual allegations made in the Amended Complaint. Sometime in 1995, one of the major shareholders of NALF, Howard Appel ("Appel"), allegedly began to seek outside financing for NALF through his relationships with brokerage and investment banking firms. Appel, a former stockbroker who had been permanently barred by the NASD in 1991 from becoming affiliated with any member of the NASD, allegedly offered NALF warrants as a "reward" for introducing the company to brokerage and banking institutions.

Sands began making a market in the stock of NALF in December 1995, allegedly around the time Appel began implementing his "reward" plan. On January 29, 1996, Sands entered into an investment banking agreement with NALF (the "Investment Banking Agreement") pursuant to which Sands introduced Conseco—its most valued and long-standing client—to NALF.

On April 23, 1996, Conseco, through two of its subsidiaries, acquired $10M in convertible debentures of NALF with a life span of eighteen months, expiring in October 1997 (the "Convertible Bonds"). At Conseco's option, the debentures were convertible into NALF common stock at the lesser of $12.00 per share or 80% of the market price of the stock on the date of conversion. In addition, Conseco received warrants to purchase 515,000 shares of NALF (the "Conseco Warrants") at an exercise price which was reduceable in the event a subsequent public offering of NALF priced shares lower than the originally agreed-upon exercise price of the Conseco Warrants. Plaintiffs allege that the market conversion feature of the Convertible Bonds and the price protection mechanism of the Conseco Warrants provided Conseco an incentive to artificially depress the stock price of NALF.

The Investment Banking Agreement was amended in April 1996 to provide for compensation to Sands for acting as NALF's investment banker in connection with the Convertible Bonds. Under the amendment, Sands received $550,000 in cash, as well as warrants to purchase 160,000 shares of NALF (the "Sands Warrants")—which also included a price protection mechanism—as its placement fee.

Sands allegedly distributed the warrants to its individual brokers soon thereafter. According to the Amended Complaint, the cash portion of Sands' fee was "unusually high," while the warrant portion of the compensation was an "unusual form" of compensation. Amended Complaint at ¶ 35. Moreover, Sands' purported distribution of warrants to individual brokers was labeled an "unusual compensation arrangement" by plaintiffs. *Id.*

In addition, plaintiffs allege three other general problems associated with the issuance of the Convertible Bonds. First, plaintiffs contend that under NASD rules, NALF was required to—but did not—obtain shareholder approval for the issuance of the Convertible Bonds. According to plaintiffs, NASD rules provide that shareholder approval is required for the placement of below-market conversion rate securities if such securities are convertible into 20% or more of the issuer's outstanding shares of common stock before their issuance. Since the combination of the Convertible Bonds and the Conseco Warrants allegedly conferred beneficial ownership of 20.1% of the outstanding shares of NALF before their issuance, NALF's failure to obtain approval was, according to plaintiffs, a violation of NASD rules.[3]

Second, because NALF relied upon the private placement exemption, § 4(2) of the Securities Act of 1933, to exempt the placement of the Convertible Bonds from the Act's registration requirements, plaintiffs contend that NALF should have filed, but failed to file, a Form D with the SEC.

Third, Robert Bartolini, Chairman of the Board and Chief Executive Officer of NALF, allegedly failed to receive the proper authorization from NALF's board of directors to sign the purchase agreement governing the sale of the Convertible Bonds from NALF to Conseco. Plaintiffs contend that these failures by NALF in connection with the issuance of the Convertible Bonds support the existence of Conseco's illicit plan to control NALF, as well as Sands' knowledge and involvement in that plan.

After Conseco's purchase of the Convertible Bonds, the Amended Complaint alleges that Sands engaged in artificially inflating the price of NALF stock through an illegal "pump and dump" scheme to enable insiders to make increased profits on sales of NALF stock. In furtherance of this scheme, plaintiffs contend that Sands made phone calls to investors, disseminated false opinions on the valuation of NALF stock, and failed to inform public investors of Conseco's plan to exercise the 80% market conversion feature of the Convertible Bonds and acquire NALF stock at severely depressed prices. Moreover, plaintiffs allege that Sands' principal market-making activity in NALF stock, coupled with its misrepresentations and omissions concerning its valuation, enabled NALF's stock price to reach an unsustainable peak in 1996 during which time corporate insiders were able to profit at the expense of public investors.

In November 1996, the Investment Banking Agreement was amended a second time to provide for a facilitation fee to Sands in connection with its efforts on a public offering of 2.5 million shares of NALF to be issued at the end of December 1996 (the "Public Offering"). Sands received $300,000 as its facilitation fee, less any actual underwriting fees and commissions it received from the Public Offering, up to $150,000. Moreover, the exercise price of the Sands Warrants, as well as the Conseco Warrants, were reduced to the Public Offering price of $7.50 pursuant to the price protection provisions provided in the warrants. NALF raised over $21 million from the Public Offering, which was used to repay short term notes and to fund additional securitizations before the expiration date of the Convertible Bonds.

---

**3.** NALF's stock was delisted by the NASD in December 1997 for the alleged failure to obtain the necessary shareholder approval in violation of NASD rules.

At the end of February 1997, NALF disclosed reserve deficiencies attributable to weak underwriting guidelines in place regarding its loan contracts from December 1995 through March 1996. Shortly thereafter, Sands purportedly reduced its earnings estimates for NALF, blaming the nonperforming loans and general industry conditions. Further, plaintiffs contend that after the disclosure, Sands engaged in conduct designed to lower the price of NALF's stock, including ceasing all market-making activities in NALF stock, removing NALF stock from its recommended list and stopping its aggressive efforts to market NALF shares. As a consequence, NALF's stock price—already trending downward—began an accelerated descent.

Despite its financial difficulties, NALF was able to complete two more securitizations prior to the expiration of the Convertible Bonds. On July 3, 1997, Conseco loaned an additional $5 million to NALF and received additional warrants from NALF to purchase over 250,000 shares of common stock at an exercise price of $.15 per share. The exercise price of the Conseco warrants was also reduced to $.15 per share. On August 21, 1997, Conseco acquired 5 million shares of Series A Preferred Stock of NALF in exchange for an additional $5 million of short term financing. Moreover, Conseco acquired all of NALF's outstanding convertible debentures held by third parties.

On October 1, 1997, Conseco converted the acquired debentures into over 1.5 million shares of NALF common stock at conversion prices ranging from $.30 to $.32 per share, and converted the Convertible Bonds into over 35 million shares of NALF common stock at a conversion price of $.32 per share, pursuant to the 80% market conversion feature. In connection with the conversion, plaintiffs allege that

Conseco caused NALF to disseminate a false and misleading information statement on Schedule 14C on November 21, 1997 (the "Information Statement"). There, plaintiffs contend that rather than solicit the necessary shareholder approval for the conversion, the Information Statement falsely represented that NALF had complied with its legal requirements and that § 203 of the Delaware General Corporation Law, requiring shareholder approval for certain business combinations with an interested shareholder, had been waived by the company. This misrepresentation, according to plaintiffs, was designed to mislead public shareholders into believing NALF had complied with Delaware law, when, in fact, it had not.

Facing a purported liquidity crisis which resulted in a slowing in the origination of receivables and a suspension of the lucrative securitization program, NALF filed a Chapter 11 petition for bankruptcy on March 23, 1998. Pursuant to a court-approved plan of reorganization, NALF's existing stock was extinguished with Conseco owning all of a new Class A shares of NALF and 80% of a new Class B shares. Other creditors received approximately 80% of the amounts owing to them.

Plaintiffs argue that the factual allegations asserted in the Amended Complaint are sufficient to allege that Sands engaged in securities fraud in violation of § 10(b) of the Exchange Act and Rule 10b–5. Sands has moved to dismiss the Amended Complaint on grounds that it fails to state a claim upon which relief could be granted and that it fails to plead fraud with particularity. *See* Fed.R.Civ.P. 12(b)(6) & 9(b). In particular, Sands argues, *inter alia,* that the Amended Complaint fails to plead allegations of fraud with particularity as required under the PSLRA, that it fails to adequately allege scienter, and that it fails to adequately allege loss causation.[4]

---

4. Defendant further argues that the Amended Complaint should be dismissed because leave to amend the original Complaint was granted only to plaintiff David Schnell and not to the new lead plaintiffs. Accordingly, Sands characterizes the Amended Complaint as an entirely new one, and that many of the claims asserted therein are time-barred.

Section 10(b) of the Exchange Act provides in relevant part:

It shall be unlawful for any person, directly or indirectly . . . —

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. 78j(b). Similarly, Rule 10b–5 makes it unlawful for

any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Therefore, in order to state a claim for securities fraud under § 10(b) and Rule 10b–5, "a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff's injury." *San Leandro Emergency Medical Group Profit Sharing Plan,* 75 F.3d 801, 807 (2d Cir.1996).

■ Here, plaintiffs also allege that defendant engaged in manipulative practices and schemes to defraud in connection with NALF shares. *See T.H.C., Inc. v. Fortune Petroleum Corp.,* No. 96 Civ. 2690, 1999 WL 182593 at *2 (S.D.N.Y. March 31, 1999). To properly state a market manipulation claim under Rule 10b–5, plaintiffs must plead "(1) damage, (2) caused by reliance on defendants' misrepresentations or omissions of material facts, or on a scheme by the defendants to defraud, (3) scienter, (4) in connection with the purchase or sale of securities, (5) furthered by the defendants' use of the mails or any facility of a national securities exchange." *Schnell,* 43 F.Supp.2d at 448 (citing *Dietrich v. Bauer,* 76 F.Supp.2d 312, 338 (S.D.N.Y.1999); *Cowen & Co. v. Merriam,* 745 F.Supp. 925, 929 (S.D.N.Y.1990)).

### I. Pleading Fraud with Particularity

■ Under the PSLRA, each allegation of misrepresentation or omission under Rule 10b–5 must be made with particularity—*i.e.,* the Amended Complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b). Moreover, Rule 9(b) requires that in all allegations of fraud, the circumstances constituting the fraud must be "stated with particularity." Fed.R.Civ.P. 9(b); *see also In re Livent, Inc. Securities Litigation,* 78 F.Supp.2d 194, 213 (S.D.N.Y.1999). In order to satisfy these heightened standards of pleading, our Court of Appeals has required that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito v. IMCERA, Inc.,* 47 F.3d 47, 51 (2d Cir.1995) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).

■ While the Amended Complaint does describe some of the alleged misrepresentations and omissions in greater detail than in the original Complaint, prob-

lems endemic to the original have still not been resolved. Specifically, plaintiff alleges that Sands engaged in the following activities to improperly inflate the price of NALF stock: (1) Sands made statements in its cold calling sales pitches throughout 1996 and in January 1997 regarding the general benefits of the Conseco relationship, including Sands' expectation that Conseco would ultimately buy out shares of NALF at a premium and its belief that NALF's book value was higher than its market value (Amended Complaint ¶ 57), (2) on eight occasions throughout 1996 and January 1997, Sands rated NALF a "buy" or "speculative buy" in its coverage through Bloomberg News, reporting price targets of $20 – $24 for NALF (Amended Complaint ¶¶ 40–42), (3) on April 25, 1996, Sands disseminated a Research Review stating, *inter alia,* that it saw "potential for NALF's stock trading at $22 – $24 per share one year forward" (Amended Complaint ¶ 58), (4) NALF disseminated a press release on April 23, 1996 disclosing Conseco's investment and quoting Conseco's chairman as stating that NALF was "well positioned to capitalize" on "significant profit opportunities" (Amended Complaint ¶ 59), (5) NALF disseminated a proxy statement on May 2, 1996 in connection with an upcoming shareholders' vote—for issues unrelated to the Convertible Bonds—stating that Conseco's beneficial ownership of NALF would be 16.75% after the issuance of the Convertible Bonds, rather than 20.1% before the issuance of the bonds (Amended Complaint ¶ 60), (6) on December 26, 1996, NALF filed a prospectus with the SEC in connection with the Public Offering where it represented that it "plan[ned] to continue to employ its securitization program as an integral component of its funding strategy and anticipates that it will generally complete securitization transactions on a quarterly basis" (Amended Complaint ¶ 66–67), and (7) Sands distributed another Research Review on December 31, 1996 opining that NALF would experience 55% earnings growth in 1997 and that "the

money raised from the [Public Offering] should fulfill NALF's capital needs through 1997" (Amended Complaint ¶ 68). In each of the statements, plaintiffs allege that material misrepresentations were made, and moreover, that Sands omitted mention of the market conversion features of the Convertible Bonds and Conseco's plan to take control of NALF at depressed prices.

These allegations of misrepresentations and omissions share a variety of deficiencies. For example, the Amended Complaint fails to identify the speaker in connection with the cold calls allegedly made by Sands throughout 1996 and early 1997, and, other than by year, fails to allege specific dates of when such calls were made. In addition, certain of the alleged misrepresentations were not made by—nor were they attributed to—Sands, including NALF's April 23, 1996 press release quoting Conseco's chairman, as well as statements made in the May 2, 1996 Proxy statement and the December 26, 1996 prospectus, which were made by NALF.

Mostly importantly, however, the Amended Complaint fails to set forth sufficient reasons "explain[ing] why the statements were fraudulent." *Acito,* 47 F.3d at 51; *see also* 15 U.S.C. § 78u–4(b) (Amended Complaint must "specify . . . reasons why the statement is misleading," and since the allegations are made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed"). The Amended Complaint does not state the reasons why any of the statements were false; rather, it couples each statement with a conclusory allegation that it was false. In addition, plaintiffs attempt to bootstrap these conclusions by relying upon the very theory they are trying to assert—namely, that because Sands must have known of Conseco's alleged plot to take control of NALF at a low market price, any statement made by Sands stating that NALF had a positive future must have been false. These

kinds of circular, speculatory and conclusory allegations are inadequate to satisfy the PLSRA's and Rule 9(b)'s requirement of particularized pleading. *See generally In re Health Management Systems, Inc. Securities Litigation,* No. 97 Civ. 1865, 1998 WL 283286 at *4 (S.D.N.Y. June 1, 1998) ("the conclusory allegation that the opposite of a statement ... is true, without further elaboration, is insufficient").

**II. Scienter**

Even if the Amended Complaint satisfied the heightened pleading requirements discussed above, it must be dismissed as it fails to adequately allege scienter. Generally, securities fraud allegations under § 10(b) and Rule 10b–5 are subject to Rule 9(b)'s scienter requirements. *See Chill v. General Elec. Co.,* 101 F.3d 263, 266 (2d Cir.1996); *Acito,* 47 F.3d at 52; *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127–28 (2d Cir.1994). In addition, the PSLRA mandates that a complaint "shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

■ The scienter required in relation to securities fraud is intent " 'to deceive, manipulate or defraud,' or knowing misconduct." *Press v. Chemical Investment Services Corp.,* 166 F.3d 529, 538 (2d Cir. 1999) (quoting *Securities and Exchange Com'n v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1467 (2d Cir.1996)). By enacting § 78u–4(b)(2) of the PSLRA, Congress "did not change the basic pleading standard for scienter in this circuit (except by the addition of the words 'with particularity')." *Novak v. Kasaks,* 216 F.3d 300, 311 (2d Cir.2000). Our Court of Appeals has required that as a pleading requirement under the PSLRA for scienter, a plaintiff may "either (a) allege facts to show that 'defendants had both motive and opportunity to commit fraud' or (b) allege facts that 'constitute strong circumstantial evidence of conscious misbehavior or recklessness.' " *Press,* 166 F.3d at 538 (quoting *Shields,* 25 F.3d at 1128); *see also Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir. 2000) (approving of the two-part test for scienter described in *Shields* ).

A. Motive and Opportunity

In reviewing the Amended Complaint's pleading of motive and opportunity, this Court is mindful that our Court of Appeals has admonished not to "create a nearly impossible pleading standard when the 'intent' of a corporation is at issue." *Press,* 166 F.3d at 538. Moreover, as explained by *Novak,* "what is required ... is not a bare invocation of 'magic words such as motive and opportunity' but an allegation of facts showing the type of particular circumstances that our case law has recognized will render motive and opportunity probative a strong inference of scienter." *Rothman,* 220 F.3d at 90 (quoting *Novak,* 216 F.3d at 311).

■ As was the case with the original Complaint, however, the Amended Complaint fails to adequately plead Sands' motive to commit the alleged securities fraud with regard to NALF's stock and its alleged takeover. For reasons discussed in this Court's previous opinion, Sands' alleged desire to realize greater transaction fees and its close relationship with Conseco are insufficient to show an improper motive. *Schnell,* 43 F.Supp.2d at 449; *see also Acito,* 47 F.3d at 54; *Ellison v. American Image Motor Co., Inc.,* 36 F.Supp.2d 628, 639 (S.D.N.Y.1999); *Fisher v. Offerman & Co., Inc.,* No. 95 Civ. 2566, 1996 WL 563141, *6 (S.D.N.Y. Oct. 2, 1996). Indeed, plaintiffs do not dispute that the Amended Complaint does not base its allegations on the motive and opportunity prong of the scienter requirements. *See* Plaintiffs' Memorandum of Law in Opposition to Sands' Motion to Dismiss, at 18.

B. Conscious Misbehavior or Recklessness

■ In the absence of motive, a plaintiff may plead scienter by identifying circum-

stances indicating conscious fraudulent behavior or recklessness. *Rothman,* 220 F.3d at 90; *Shields,* 25 F.3d at 1129; *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989) (en banc). In such a case, the strength of the circumstantial allegations must be correspondingly greater. *Beck,* 820 F.2d at 50. Accordingly, "[i]n order to satisfy this pleading requirement, a plaintiff must now plead specific facts that create a *strong inference* of either knowing misrepresentation or conscious recklessness" by the defendant. *In re Health Management Systems,* 1998 WL 283286, at * 6 (emphasis added); *see also Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990); *In re Glenayre Technologies, Inc. Securities Litigation,* 982 F.Supp. 294, 297 (S.D.N.Y.1997); *In re Blech Securities Litigation,* 961 F.Supp. at 579.

■ Plaintiffs contend that the Amended Complaint alleges facts that constitute strong circumstantial evidence of Sands' *actual* knowledge of fraud. Plaintiffs' allegations of circumstantial evidence fall generally into four categories: (1) circumstances surrounding the Convertible Bonds, including NALF's purported disregard of the NASD rules, Delaware law and SEC filing requirements, as well as nature of the bonds' market conversion feature, (2) the timing of Sands' market-making activities and its alleged misrepresentations and receipt of fees, (3) the close relationship between Conseco and Sands, including Sands' dual roles as NALF's investment banker and placement agent for the Convertible Bonds, and (4) Appel's alleged role in his dealings with Sands. None of these assertions, taken individually or in the aggregate, provide the strong

inference necessary to adequately allege scienter in a securities fraud action.

First, plaintiffs contend that circumstances surrounding the issuance of the Convertible Bonds lead to a strong inference that Sands was aware of fraudulent activity. In particular, plaintiffs refer to NALF's alleged violation of the NASD's shareholder approval requirements, the alleged failure of NALF's Chief Executive Officer to receive the proper authorization from NALF's board to sign the securities purchase agreement, NALF's alleged failure to file Form D with the SEC in connection with the placement of the Convertible Bonds, and NALF's alleged failure to obtain shareholder approval of Conseco's conversion of the Convertible Bonds in violation of Delaware law. Although plaintiffs do not state exactly how these allegations amount to fraudulent or reckless intent on the part of Sands, it is reasonable to assume that plaintiffs mean to use these instances to support the existence of Conseco's "secret" scheme to take control of NALF by characterizing them as attempts to hide the existence of the Convertible Bonds, particularly its market conversion feature, from the public shareholders. *See* Amended Complaint § 93.

Any notion that Delaware law, NASD rules and SEC filing rules were purposefully violated in order to hide the existence of the Convertible Bonds is belied by the detailed description of those securities in NALF's publicly disclosed filings with the SEC.[5] In NALF's Quarterly Report on Form 10–Q filed May 14, 1996 ("NALF 10–Q")—less than one month after the issuance of the Convertible Bonds—the company specifically disclosed that it had raised $10 million in convertible debt with an exercise price of the lower of $12.00 or 80% of the market stock price. *See* NALF 10–Q, Notes to Consolidated Financial

---

5. For purposes of this opinion, the Court may consider public disclosure documents filed with the SEC, as well as documents which plaintiffs rely upon in their Amended Complaint. *See Cortec Industries, Inc. v. Sum*

*Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir. 1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991).

Statements, note 5. Further, the NALF 10–Q described the Convertible Bonds in detail under the section entitled "Private Placement of Convertible Subordinated Debentures," highlighting the market conversion feature and warning that the Convertible Bonds were not redeemable by NALF at any time.

Similarly, the Convertible Bonds were fully disclosed in NALF's December 23, 1996 Prospectus—issued nearly a full year prior to Conseco's actual conversion of the bonds. There, under "Risk Factors," NALF clearly warned the public of the possibility of "substantial dilution from convertible securities," specifically referring to $38.8 million outstanding in convertible debentures and cautioning that "holders of [these convertible debentures] may exercise their rights of conversion … at prices below the trading price of the Company's Common Stock at the time of conversion." Prospectus at 13. Moreover, under the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operation," the prospectus painfully detailed the relevant aspects of the Convertible Bonds, including the 80% market conversion feature, and the material details of NALF's outstanding warrants. *See* Prospectus at 29–30.

Plaintiffs' accusation that NALF knowingly dodged state, federal and exchange rules in order to keep the nature of the Convertible Bonds a secret from shareholders does not make sense in light of the full, detailed disclosure of those securities in public filings prior to the realization of Conseco's alleged scheme.

Moreover, the alleged violations of Delaware, NASD and SEC rules by NALF fail to show the requisite intent on the part of

Sands. To the extent they show an intent to deceive, at best they are indications of NALF"s intent, not Sands'. Other than by conclusory and speculative allegations stating that Sands must have known of the violations due to its role as NALF"s and Conseco's investment banker, the Amended Complaint does not connect Sands with NALF"s purported violations.[6] Such conclusory allegations are insufficient to allege scienter in the absence of facts giving strong inference of fraudulent intent. *See In re Blech*, 961 F.Supp. at 580.

Plaintiffs also suggest that the mere existence of the 80% market conversion feature with regard to the Convertible Bonds leads to an inference of fraudulent intent on the part of Sands. According to plaintiffs, the holder of a security with a market conversion feature benefits from a lower stock price because the cost of conversion to equity is cheaper. This reverse market incentive, according to plaintiffs, supports the existence of Sand's knowledge of a fraudulent scheme. *See* Amended Complaint ¶¶ 46–48.

However, in order to exercise the conversion feature of the Convertible Bonds, Conseco would be required to forgo repayment of its $10 million loan to NALF in exchange for the right to purchase a non-performing stock—a risky proposition at best. This reality discounts plaintiffs' notion that Conseco would expect to receive an undeserved windfall through conversion of the Convertible Bonds. Also, in addition to fully disclosing the existence of the conversion features to the public, NALF had issued, by late 1996, millions of debentures with conversion features similar to those of the Convertible Bonds to investors other than Conseco, including Merrill

---

**6.** Defendant attaches to its motion a number of documents—such as a legal opinion from NALF's counsel, a copy of the resolutions of NALF's board of directors, and the representations and warranties section of the securities purchase agreement—which tend to show that NALF made affirmative representations that all the required approvals and pre-conditions, including SEC filings, requisite board

approvals, and shareholder approvals, had been properly received prior to the issuance of the Convertible Bonds. Plaintiffs, however, argue that this Court may not consider such documents in this stage of the proceedings. That debate need not be decided here, since—for reasons discussed above—the Court does not rely upon these documents for its conclusions on this issue.

Lynch, Westminster Capital and Michael Karp—none of whom were alleged to be involved with Sands in any way. Merely labeling such debentures as "toxic," "death spiral" or "resembl[ing] ... a transaction with a loan shark" (Amended Complaint ¶ 48) is insufficient to allege scienter on the part of Sands.

Second, plaintiffs contend that the timing of Sands' market-making activities in NALF stock, its purported misrepresentations concerning NALF's valuation and future prospects, and its receipt of banking-related fees provide allegations of circumstantial evidence of fraudulent intent on the part of Sands.

In connection with Sands' market-making activities, the Court's review of NALF's monthly trading report provided by the NASD reveals no inference of fraudulent or reckless intent on account of such activities.[7] Sands was one of over thirty different sophisticated market-makers of NALF stock in between 1995 and early 1997, including Oppenheimer, First Boston, Prudential and Smith Barney, and, in any given month, Sands' trading volume averaged around 200,000 shares, topping out at less than 400,000 shares in its most active month. In comparison, NALF's total monthly trading volume for market-making activity ranged from anywhere between over 1 million shares to more than 4 million shares, with a total of approximately 6 million to 10 million shares outstanding in NALF during the time Sands participated in market-making. Indeed, during the time that plaintiffs contend Sands was purportedly "pumping" the stock to artificially inflate it, NALF's price went from around $15 – $16 per share in December 1995 (the first month of Sands's market-making) to approximately $8 – $9 per share towards the end of December 1996, around the time of the Public Offering—a nearly 50% reduction.[8]

With regard to alleged misrepresentations on the part of Sands, as discussed earlier (supra Section I), none of those alleged statements in the Amended Complaint properly articulated reasons as to why they were false at the time they were allegedly made. *See San Leandro,* 75 F.3d at 813 ("Plaintiffs have made no showing that defendants' descriptions of [the company's] performance were not based on the facts available to the company at the time the statements were made."); *In re Health Management Systems,* 1998 WL 283286, at *5 ("the complaint wholly fails to specify how the statements ... were false at the time they were made."). As such, the Amended Complaint "obviously fails to allege facts constituting circumstantial evidence of reckless or conscious misbehavior on the part of defendants in making the statements" for purposes of scienter. *San Leandro,* 75 F.3d at 813.

■ Further, conceding that most of alleged misrepresentations were various optimistic statements and news releases by Sands, such statements, without more, are insufficient to support a claim for securities fraud. *See Shields,* 25 F.3d at 1129 ("misguided optimism is not a cause of action, and does not support an inference of fraud. We have rejected the legitimacy of 'alleging fraud by hindsight.' ") (quoting *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978)); *see also Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 117 (2d Cir.

---

7. The information on the monthly trading report provided by NASD was relied upon by plaintiff in making their allegations in the Amended Complaint. Moreover, as plaintiffs themselves attached the same report to their opposition papers in connection with the dismissal of the original Complaint, it has been clearly in plaintiffs' possession for some time. Accordingly, this Court may consider the trading report in deciding this opinion. *See Cortec,* 949 F.2d at 48 (permitting a court to consider "documents that plaintiff had either in its possession" or documents which plaintiff "had knowledge of and upon which they relied in bringing suit.").

8. The implications of the trading report on defendant's claim that the Amended Complaint fails to allege loss causation need not be addressed here.

1982) ("economic prognostication, though faulty, does not, without more, amount to fraud.") (internal quotation omitted). While plaintiffs contend that defendant had access to facts that contradict these generally optimistic reports, other than by reference to plaintiffs' theory of Conseco's scheme, plaintiffs fail to "specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309.

In connection with the two amendments to the Investment Banking Agreement used to provide Sands with fees for the placement of the Convertible Bonds and for the Public Offering, as stated previously, there is nothing inherently fraudulent about an underwriter's motive to earn fees. *See, e.g., Acito*, 47 F.3d at 54; *Ellison*, 36 F.Supp.2d at 639; *Fisher*, 1996 WL 563141, at *6. Sands earned these fees in connection with actual and documented transactions—*e.g.*, the placement of the bonds and facilitation and underwriting activities for the Public Offering. Allegations that plaintiffs believe the fee amounts and arrangements to be "unusual," without more, is insufficient to plead scienter.

Third, plaintiffs contend that the relationship between Conseco and Sands supports allegations of scienter. However, as discussed in the Court's previous opinion, allegations of a close relationship fail to establish the kind of circumstantial evidence necessary to support a claim of fraudulent or reckless intent. *See Schnell*, 43 F.Supp.2d at 449. In addition, a desire by Sands to maintain that relationship is not unlike its desire to earn underwriting fees, discussed *supra*, and, similarly, is not sufficient to satisfy the pleading requirements for scienter. *Id.*

Finally, plaintiffs' argue that Appel's supposed role in dealing with Sands provides circumstantial support for Sands' fraudulent intent. It is not clear to this Court how an allegation that one of NALF"s major shareholders had been disciplined by the NASD helps to establish the requisite level of scienter required by the PSLRA. Even if Sands knew of Ap-

pel's problem with the NASD, this Court is not persuaded that the nature of its purported contacts with Appel, as set forth in the Amended Complaint, provides an inference that Sands may have behaved with the level of scienter required by the PSLRA.

In sum, plaintiffs' allegations in the Amended Complaint, considered either in the aggregate or individually, fail to set forth facts that "give rise to a strong inference of fraudulent intent," *In re Time Warner*, 9 F.3d 259, 268 (2d Cir.1993) (internal quotations omitted), and, consequently, are insufficient to satisfy the scienter requirements for securities fraud under 10(b) or Rule 10b–5. *See Novak*, 216 F.3d at 311; 15 U.S.C. § 78u–4(b)(2).

## CONCLUSION

For the foregoing reasons, the Amended Complaint is dismissed. As plaintiffs have been provided opportunities to correct the deficiencies of the original Complaint, but have failed to do so, the dismissal is with prejudice. The Clerk of the Court is directed to dismiss the Amended Complaint with prejudice.