901 A.2d 871

NCP LITIGATION TRUST, PLAINTIFF–RESPONDENT,
v. KPMG LLP, DEFENDANT–APPELLANT.

Argued January 3, 2005—Decided June 28, 2006.

354

*Mitchell A. Karlan,* a member of the New York bar, argued the cause for appellant (*Drinker Biddle & Reath,* attorneys; *Mr. Karlan, Vincent E. Gentile* and *Karen A. Denys,* on the briefs).

*James G. Flynn,* a member of the New York bar, argued the cause for respondent (*Lite DePalma Greenberg & Rivas,* attorneys; *Allyn Z. Lite* and *Katrina Blumenkrants,* on the brief).

*Richard I. Miller,* a member of the New York bar, argued the cause for amici curiae, The American Institute of Certified Public Accountants and The New Jersey Society of Certified Public Accountants (*Riker, Danzig, Scherer, Hyland & Perretti,* attor-

neys; *Mr. Miller* and *Michael K. Furey,* of counsel; *Mr. Furey* and *Michael E. Gogal,* on the brief).

Justice ZAZZALI delivered the opinion of the Court.

In the mid–1990s, two officers of a corporation intentionally misrepresented details concerning the corporation's financial status to an independent auditing firm. That firm in turn failed to detect those misrepresentations for several years. After subsequent audits revealed the officers' fraud, the corporation was forced to acknowledge previously unreported losses of tens of millions of dollars and to declare bankruptcy. A litigation trust, acting as the corporation's successor-in-interest and representing the corporation's shareholders, filed suit against the auditor for negligently conducting the audit. The trial court granted the auditor's motion to dismiss based on the imputation doctrine, which holds that knowledge of an agent generally is attributed to its principal. The trial court concluded that the fraud was imputable to the litigation trust, as the corporation's successor, and that the litigation trust cannot sue the auditor unless the auditor intentionally and "material[ly] participat[ed]" in the fraud. The Appellate Division reversed, concluding that the trust's complaint alleged sufficient facts to support an equitable fraud claim against the auditor.

In this matter, we therefore must decide whether the imputation doctrine bars the litigation trust's action. We hold that the imputation doctrine does not bar corporate shareholders from recovering through a litigation trust against an auditor who was negligent within the scope of its engagement by failing to uncover or report the fraud of corporate officers and directors. Imputation, however, may be raised as a defense by auditors to bar such claims against corporate shareholders who engaged in or were aware of the wrongdoing of corporate agents. In light of our holding, and for the reasons set forth below, we affirm the Appellate Division decision, as modified, and remand this matter to the trial court for reinstatement of the complaint.

I.

A.

Physician Computer Network, Inc. (PCN), a publicly traded New Jersey corporation with offices in Morris Plains, was engaged in the business of developing and marketing software to assist doctors in communicating with hospitals, insurers, laboratories, and group health care providers. From mid–1993 until mid–1998, PCN retained defendant KPMG LLP, an international accounting firm with a regional office in Short Hills, as its independent auditor. During that time, two PCN officers, John Mortell and Thomas Wraback, served as the primary contacts with KPMG. John Mortell was a director of PCN during all relevant times and PCN's President from January 1998 until March 1998, when he was removed from his position. Mortell also served as the corporation's Chief Financial Officer from May 1992 to March 1995 and as its Executive Vice President and Chief Operating Officer from March 1995 to December 1997. Thomas Wraback was PCN's Senior Vice President and Chief Financial Officer from September 1996 until August 1998, when PCN terminated his employment.

During the mid-to-late 1990s, Mortell and Wraback orchestrated a series of fraudulent transactions to inflate PCN's reported revenues and reduce its reported expenses. On April 1, 1996, PCN filed its annual report on Form 10–K with the Securities and Exchange Commission (SEC) for the fiscal year ending on December 31, 1995. In that filing, PCN reported revenues of over $41 million for 1995, a 104% increase over revenues of approximately $20 million in 1994, and a 584% increase over revenues of approximately $6 million in 1993. Despite that increase, the corporation also reported a net loss before extraordinary items of over $11 million. The 1995 financial statements were accompanied by an unqualified audit opinion by KPMG directed to PCN's Board and stockholders, stating:

> We have audited the consolidated financial statements of the Physician Computer Network, Inc. and subsidiaries as of December 31, 1995 and 1994, and the

related consolidated statements of operations, changes in shareholders' equity (deficiency), and cash flows for each of the years in the three-year period ended December 31, 1995. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Physician Computer Network, Inc. and subsidiaries as of December 31, 1995 and 1994, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1995, in conformity with generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, and in all material respects, the information set forth therein.

The following day, April 2, 1996, PCN issued a press release announcing that it had filed a registration statement and prospectus with the SEC to offer seven million shares of PCN's common stock for sale to the public. PCN later filed an amended statement with the SEC, lowering that amount to 5.6 million shares. With KPMG's express consent, each SEC registration statement and prospectus included a copy of the corporation's audited financial statements for 1995 and KPMG's accompanying audit report.

Two months later, PCN issued another press release, this time announcing that PCN had signed an agreement with Wismer–Martin Inc., another provider of practice management systems, for PCN to acquire that company, by merger, subject to Wismer–Martin shareholder approval. The agreement provided that PCN was to obtain all of Wismer–Martin's issued and outstanding stock in exchange for approximately $2 million in cash and 935,000 shares of PCN common stock. In connection with that merger, PCN filed a form S–4 registration statement with the SEC, which, with the express consent of KPMG, included PCN's audited

financial statements for 1995 and KPMG's corresponding audit report. Wismer–Martin merged with PCN in September 1996.

In 1997, PCN filed its annual report for 1996 with the SEC, which included its audited financial statements for the year ending on December 31, 1996, and an unqualified audit opinion by KPMG, stating that KPMG's audit was conducted in accordance with Generally Accepted Auditing Standards (GAAS) and Generally Accepted Accounting Principles (GAAP). According to those financial statements, PCN's 1996 revenues were almost $96 million, more than double that of 1995. Throughout 1997, PCN continued to report increased revenues and income as compared to corresponding periods in the prior year.

During the course of its audit work for the fiscal year ending on December 31, 1997, KPMG discovered several accounting irregularities. In February 1998, KPMG raised those concerns with Mortell, Wraback, and PCN's outside counsel. As a result, on March 3, 1998, the corporation issued a press release announcing that it would restate its previously reported financial results for each of the first three quarters of 1997 and instead report a loss from operations for each of those quarters. The corporation also announced that it would report a loss for the fourth quarter of 1997, yielding a total expected loss of between $27 and $31 million for the year. In that same announcement, the corporation stated that Mortell had "taken a temporary leave of absence" pending completion of the corporation's 1997 audit. Following those disclosures, the price of PCN stock fell seventy percent, hitting a record low.

In April 1998, PCN announced both that KPMG was withdrawing its auditor's report for 1996 and that PCN had appointed a Special Committee of its Board to conduct an investigation into the matter. From April 1998 to June 1998, KPMG continued its audit procedures and found additional irregularities in the 1996 consolidated statements. At the end of August, PCN filed a Form 8–K with the SEC, disclosing that KPMG had withdrawn its audit opinion for the 1994 and 1995 fiscal years and had discovered that

the financial statements for the 1995 and 1996 fiscal years would need to be restated. PCN also disclosed that KPMG was no longer acting as independent auditor for the corporation, although the parties dispute whether PCN dismissed KPMG or KPMG resigned. PCN subsequently retained the accounting firm of Arthur Anderson to complete the audit of its 1997 financial statements and to restate its fiscal results for 1995 and 1996.

The effect of PCN's announcements and disclosures was disastrous for the corporation. Thereafter, PCN continually operated at a cash flow deficit and was in default on its bank debt. The corporation ultimately filed a petition for bankruptcy on December 7, 1999. As part of the bankruptcy plan, the corporation's assets were acquired by Medical Manager Corporation. PCN no longer operates as a public corporation.

## B.

Beginning in 1998, several class action lawsuits were filed against PCN on behalf of various shareholder groups and consolidated in the United States District Court for the District of New Jersey. The consolidated action, which eventually settled for $21,150,000, was comprised of persons who purchased or otherwise acquired PCN common stock from February 1996 to April 1998. The settlement expressly denoted that it did not preclude claims against KPMG, Mortell, or Wraback. Nine months later, the same group settled their claims against Mortell and Wraback for $45,000, to "be used to fund the investigation and prosecution of claims the Class may have against KPMG."

Then, in 2001, a class of plaintiffs, consisting of shareholders for the period of April 1996 through April 1998, filed suit against KPMG in the United States District Court for the District of New Jersey. The complaint alleged securities fraud violations under Section 10(b) of the Securities Exchange Act of 1934 in connection with KPMG's 1995 and 1996 audits and Section 11 of the Securities Act of 1933 in connection with the 1995 audit. KPMG filed a motion to dismiss. In an unpublished opinion, Judge Dickinson

Debevoise dismissed the plaintiffs' claims with prejudice, finding that they had failed to state a claim and failed to plead fraud with particularity.

In 2002, the SEC filed a complaint in the United States District Court for the District of Columbia, charging six former officers and managers of PCN, including Mortell and Wraback, with accounting fraud. The SEC also filed a notice of settlement, indicating that all defendants had consented to the entry of "a permanent injunction enjoining [each person] from violating or aiding or abetting violations of the anti-fraud, periodic reporting, record-keeping, internal controls and lying to the auditors provisions of the federal securities laws." As part of the settlement, Mortell agreed to be permanently barred from acting as an officer or director of a public company, and Wraback agreed to be barred for ten years.

## C.

The present action against KPMG was filed in May 2002 by plaintiff NCP Litigation Trust (Trust). The Trust was created pursuant to PCN's confirmed bankruptcy plan, approved by the United States Bankruptcy Court for the District of New Jersey. The formal agreement creating the Trust provides:

> [T]he Debtors [PCN and related entities] have agreed to contribute to the Litigation Trustee in trust ... all of their interests in any Causes of Action (the "Litigation Claims") ... [and] have requested that the Litigation Trustee enforce the Litigation Claims, if any, for the benefit of all holders of Allowed Class 7B Equity Interests....

The record reflects that the term "Allowed Class 7B Equity Interests" refers to shareholders of the debtor corporation.

The Trust's amended complaint alleges that KPMG committed negligence, negligent misrepresentation, breach of contract, and breach of fiduciary duty. As part of those allegations, the Trust asserts that KPMG failed to perform its audits in conformity with GAAS and GAAP, the professional guidelines that auditors must adhere to while conducting an audit. In essence, the Trust claims that

KPMG negligently failed to exercise due professional care in the performance of its audits and in the preparation of the financial statements and audit reports. Had KPMG not performed negligently, and had it instead exercised due care, it would have detected PCN's fraud and prevented the losses PCN suffered.[1]

According to the Trust, PCN's 1995 financial records, which KPMG certified, were in such disarray that the successor auditor, Arthur Anderson, was unable to reconstitute them. The Trust also cites an investigation by the Special Committee of PCN's Board that found that the corporation's 1995 fiscal results had been overstated. PCN's 1996 financial records also are alleged to have suffered from substantial irregularities. For example, KPMG purportedly failed to verify PCN's receipt and deposit of a $3.5 million check that was part of a fraudulent asset purchase arranged by Mortell and Wraback. According to the Trust, a simple examination of PCN's bank records would have revealed that this amount—the largest single source of PCN's 1996 income—was never deposited. KPMG also allegedly allowed for the improper reversal of an approximate $1.8 million liability, thereby offsetting an increase in PCN's accounts receivable reserve, even though "KPMG knew that the reversal of [that] obligation was not supported by GAAP."

The complaint further alleges that KPMG failed to discover PCN's improper recognition of income on its software maintenance agreements. Specifically, PCN entered into maintenance service contracts with its software customers that required customers to pay the fees for the entire maintenance contract when the contract was executed. The Trust alleges that KPMG neglected to comply with GAAP because, although PCN received payment up front for the full amount of the maintenance contracts, GAAP requires that revenue be recognized over time as the services are provided, not at the time of the initial sale. As a result, PCN reported nearly $1.5 million in 1996 that was not actually earned until 1997. The Trust also maintains that KPMG

---

[1] This allegation and all other statements below are derived from the Trust's complaint and have not been substantiated at this early stage in the proceedings.

violated GAAS by failing to require PCN to accrue liabilities of approximately $1.5 million in vacation and bonus pay expenses, which were incurred in 1996 but that would not be paid until the following year.

Finally, the complaint asserts that individual audit team members were distracted and deficient in the performance of their duties:

> The KPMG audit team assembled for the 1996 audit was not a strong one. Upon information and belief, the partner on the PCN audit for years was distracted by another client which was having substantial trouble which required him to spend a lot of time away from PCN during the audit. The audit manager was new to the PCN audit and was therefore unfamiliar with the Company. Also, the audit senior, who was also new to the PCN audit, was so preoccupied about leaving KPMG to attend law school that he spent substantial time asking Wraback about apartment-hunting in New York rather than performing the necessary audit work; his audit work suffered as a result.

KPMG moved to dismiss, contending that the fraud of Mortell and Wraback, as agents of PCN, should be imputed to the Trust, as PCN's successor-in-interest, thereby barring the Trust's action against KPMG. The trial court agreed and granted the motion. The court reasoned that to defeat the imputation defense the Trust would have to show "that there has been a material participation by the third party, a material form of culpability." After reviewing the record, the court concluded that it found "no evidence of any material fault, accounting irregularity, [or] participation of the defendants in the fraudulent conduct of these senior participants that would in any way be deemed sufficient to estop the rule of imputation as the case was in [*In re Integrity Insurance Co.*, 240 *N.J.Super.* 480, 573 *A.*2d 928 (App.Div.1990),]" New Jersey's only decision addressing application of the imputation defense in the corporate auditing context.

In an unreported decision, the Appellate Division reversed in part, concluding that "*Integrity* supports the sufficiency of [the Trust's] complaint." In the panel's view, "[n]egligence, negligent misrepresentation, and breach of contract, as well as legal fraud, surely can be culpable conduct that 'contributed to the misconduct of another.'" As such, the Appellate Division found that "[t]he

trial court read *Integrity* too narrowly when it essentially held that only legal fraud by the third party would constitute sufficiently culpable conduct to defeat the imputation defense." The panel concluded that the imputation defense was not available to KPMG because the Trust's complaint, fairly read, alleges that KPMG committed equitable fraud independent of any legal fraud committed by PCN's officers. The panel, however, upheld the trial court's dismissal of the Trust's claim for breach of fiduciary duty.

KPMG appealed, and we granted certification. 181 *N.J.* 286, 854 *A.*2d 919 (2004). We also granted amicus curiae status to the American Institute of Certified Public Accountants and to the New Jersey Society of Certified Public Accountants.

## II.

At the outset, we observe that this matter is before us on a *Rule* 4:6–2(e) motion to dismiss. On such motions, a trial court should grant a dismissal "in only the rarest of instances." *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 *N.J.* 739, 772, 563 *A.*2d 31 (1989). A court's review of a complaint is to be "undertaken with a generous and hospitable approach," *id.* at 746, 563 *A.*2d 31, and the court should assume that the nonmovant's allegations are true and give that party the benefit of all reasonable inferences, *Smith v. SBC Communications Inc.*, 178 *N.J.* 265, 282, 839 *A.*2d 850 (2004). If "the fundament of a cause of action may be gleaned even from an obscure statement of claim," then the complaint should survive this preliminary stage. *Craig v. Suburban Cablevision, Inc.*, 140 *N.J.* 623, 626, 660 *A.*2d 505 (1995) (citation omitted).

The liberal standard that governs a motion to dismiss has particular relevance to imputation cases because "[d]eciding whether to permit an auditor to utilize imputation requires a detailed factual analysis of the dispute." Maureen Mulligan et al., *Recent Developments in the Law Affecting Professionals, Officers, and Directors*, 36 *Tort & Ins. L.J.* 519, 535 (2001). Consequently, many courts have held that the applicability of the imputation

defense to a particular case cannot be determined on a motion to dismiss or on a motion for summary judgment. *See, e.g., In re Crazy Eddie Sec. Litig.,* 802 *F.Supp.* 804, 817–18 (E.D.N.Y.1992) (denying motion to dismiss because "resolution of the [imputation] issue must await trial"); *In re Sec. Investor Prot. Corp. v. R.D. Kushnir & Co.,* 274 *B.R.* 768, 782 (Bkrtcy.N.D.Ill.2002) (concluding availability of imputation defense requires fact intensive review of record and thus should be determined at trial); *In re Wedtech Sec. Litig.,* 138 *B.R.* 5, 9–10 (S.D.N.Y.1992) (denying summary judgment on application of imputation defense); *First Nat'l Bank v. Brumleve & Dabbs,* 183 *Ill.App.*3d 987, 994–95, 132 *Ill.Dec.* 314, 318, 539 *N.E.*2d 877, 881 (1989) (concluding that trial court erred in relying on imputation defense during motion to dismiss).

## III.

The imputation doctrine is derived from common law rules of agency relating to the legal relationship among principals, agents, and third parties. Pursuant to those common law rules, a principal is deemed to know facts that are known to its agent. *Restatement (Third) of Agency* § 5.03 (Tentative Draft No. 6, 2005) ("[N]otice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of that fact is material to the agent's duties to the principal."). Courts have used interchangeable terms to express this legal rule with some describing the principal as "imputed" with the agent's knowledge, *Hercules Powder Co. v. Nieratko,* 113 *N.J.L.* 195, 199, 173 *A.* 606 (Ch.Ct.1934), and others stating that the principal has "constructive knowledge," *Hollingsworth v. Lederer,* 125 *N.J.Eq.* 193, 206, 4 *A.*2d 291 (E. & A.1939) (per curiam), or "constructive notice," *Integrity, supra,* 240 *N.J.Super.* at 506, 573 *A.*2d 928, of the agent's knowledge. *See also post* (using terms interchangeably). Regardless of the terminology, the purpose of the doctrine is the same—to protect innocent third parties with whom an agent deals on the principal's behalf. *See Nischne v. Firestone Tire & Rubber Co.,* 116 *N.J.Eq.* 305, 308, 173 *A.* 341 (Ch.Ct.1934) ("The rule of

implied notice is invocable to protect the innocent, never to promote an injustice."). Principals thereby are prevented "from obtaining benefits through their agents while avoiding the consequences of agent misdeeds." Andrew J. Morris, *Clarifying the Imputation Doctrine: Charging Audit Clients with Responsibility for Unauthorized Audit Interference*, 2001 *Colum. Bus. L.Rev.* 339, 350 (2001).

■ Under the doctrine, a third party may invoke imputation as a defense against a principal seeking to enforce an agreement when the principal's agent fraudulently induced the third party to enter into that agreement. In other words, an agent's fraud is imputed to a principal, thereby barring the principal from suing the third party. *See Gordon v. Cont'l Cas. Co.*, 319 *Pa.* 555, 181 *A.* 574, 578 (1935) ("A principal who sues to enforce a contract is bound by the representations made by his agent, in order to induce the opposite party to make it.") (citation omitted). Courts have found that it is unfair to allow a principal to enforce an agreement in such a situation, even when both the principal and the third party have acted in good faith. The party who selected the agent—the principal—should bear the loss stemming from the agent's misconduct. *Ibid.*

Imputing an agent's actions and knowledge to the principal serves several salutary purposes. By allocating the risk of injury to the principal, the imputation doctrine "creates incentives for a principal to choose agents carefully and to use care in delegating functions to them." *Restatement (Third) of Agency, supra,* § 5.03 cmt. b. Because the principal cannot avoid responsibility through ignorance, imputation also "encourages a principal to develop effective procedures for the transmission of material facts, while discouraging practices that isolate the principal or co-agents from facts known to an agent." *Ibid.* Moreover, third parties who are aware that the principal is ultimately accountable for its agent's actions and representations are more likely to conduct business through an agent.

However, the rationale for imputation in a simple principal-agent relationship begins to break down in the context of a corporate audit where the allocation of risk and liability among principals, agents, and third parties becomes more complicated. As noted, this matter involves corporate officers who, as agents of the corporation, committed accounting fraud, and a third-party auditor that allegedly was negligent in failing to discover the resulting inaccuracies in the financial records. If the officers' wrongful conduct is imputed to the corporation, the corporation itself can be said to have committed the fraud. Further, the wrongdoing also may be imputed to the corporation's successor-in-interest who then would be estopped from suing the allegedly negligent third-party auditor.

Such an application of the imputation defense has been criticized, however, because "agency doctrines ... operate on an all-or-nothing basis." Deborah A. DeMott, *When is a Principal Charged with an Agent's Knowledge*, 13 *Duke J. Comp. & Int'l L.* 291, 319 (2003). That is, the negligent auditor either faces total liability or none. Morris, *supra*, 2001 *Colum. Bus. L.Rev.* at 353 ("As a device for assigning responsibility, [imputation] is unforgivingly binary."). Those disparate results seem "severe and unmodulated by concern for the specifics of individual cases." Demott, *supra*, 13 *Duke J. Comp. & Int'l L.* at 319. Absolving negligent corporate auditors "is difficult to rationalize and to justify or explain in any satisfying or comprehensive way." *Id.* at 291 (citation omitted). As a result, "courts have struggled to determine what circumstances permit an auditor to invoke this defense." Mulligan, *supra*, 36 *Tort & Ins. L.J.* at 533.

## IV.

With that background as our guide, we turn to the issue in this appeal—whether the imputation doctrine bars the Trust, representing shareholders of PCN, from bringing suit against the corporation's auditor for its alleged negligence in failing to detect the fraud of PCN's directors and officers.

KPMG argues that the Trust should be barred by the imputation doctrine under both this jurisdiction's prior decision in *Integrity, supra,* 240 *N.J.Super.* 480, 573 *A.*2d 928, and the Seventh Circuit's decision in *Cenco, Inc. v. Seidman & Seidman,* 686 *F.*2d 449 (7th Cir.), *cert. denied,* 459 *U.S.* 880, 103 *S.Ct.* 177, 74 *L.Ed.*2d 145 (1982). KPMG first claims that under *Integrity*—the only decision to address this issue in New Jersey—the imputation defense bars all claims against a corporate auditor unless a plaintiff alleges that the auditor was an active and knowing participant in the fraud. Here, because the Trust does not allege active participation on the part of KPMG, KPMG contends that the imputation defense bars the Trust's claims. The Trust responds that *Integrity* is not limited to "active participation," but rather, allows a claim by a corporation's successor-in-interest against third-party auditors if the auditor "contributed to" the underlying misconduct. Alternatively, KPMG argues that because the Trust represents the shareholders of PCN, the Court should follow the Seventh Circuit's decision in *Cenco* and hold that tort principles require that the imputation doctrine bars the Trust's suit. The Trust counters that because imputation is a state law issue, this Court should rely on New Jersey jurisprudence.

Those arguments require that we consider whether this State's jurisprudence permits the Trust to maintain an action for negligence. Because the Trust represents shareholders of PCN, we also must determine whether to follow *Cenco* and hold that the imputation doctrine bars suit on behalf of shareholders.

V.

A.

The Supreme Court teaches that the application of the imputation doctrine is a matter of state law. *O'Melveny & Myers v. FDIC,* 512 *U.S.* 79, 83–85, 114 *S.Ct.* 2048, 2052–54, 129 *L.Ed.*2d 67, 72–74 (1994). As indicated above, the only New Jersey decision to consider whether the imputation doctrine applies in the corporate

auditing context is *Integrity*. In that case, an insurance company became insolvent after alleged mismanagement and fraud by the company's directors and officers. *Integrity, supra,* 240 *N.J.Super.* at 485–87, 573 *A.2d* 928. A liquidator was appointed to seek recovery "on behalf of the creditors, policyholders or shareholders" of the failed insurance company. *Id.* at 486, 573 *A.2d* 928. The liquidator sued the insurance company and its directors and officers for fraudulently "conceal[ing] the company's true economic condition by preparing and disseminating materially false financial statements" that, in turn, resulted in insolvency. *Id.* at 487–88, 573 *A.2d* 928. The liquidator also sued the company's auditor, alleging that it negligently failed to discover the fraud and enabled managerial misconduct to bankrupt the company. *Id.* at 487, 573 *A.2d* 928. Specifically, the liquidator asserted claims against the auditor for malpractice, negligence, negligent misrepresentation, gross negligence, recklessness, fraud, aiding and abetting fraud, and for violations of New Jersey's anti-racketeering and consumer fraud statutes. *Ibid.* According to the complaint,

> as a result of mismanagement and fraud, the [defendant officers and directors] caused Integrity to become statutorily insolvent ... and then, with the active participation of [the auditor], concealed the company's true economic condition by preparing and disseminating materially false financial statements.
>
> [*Id.* at 488, 573 *A.2d* 928.]

In response, the auditor argued that "any knowledge by the individual defendant officers and directors must be imputed to [the insurance company] as a corporation," and, therefore, the liquidator's action should be barred by the imputation defense. *Id.* at 505, 573 *A.2d* 928. The Appellate Division rejected that argument and disallowed the imputation defense, explaining that " '[t]he doctrine of constructive notice to the principal is not available' to one who contributed to the misconduct sought to be imputed." *Id.* at 506, 573 *A.2d* 928 (quoting *Nischne, supra,* 116 *N.J.Eq.* at 308, 173 *A.* 341). Consequently, the court determined that the accountant's "culpability, if established, would estop it from raising the defense of imputation." *Ibid.* The panel reasoned that the auditor should not be able to avoid responsibility for its own misdeeds because imputation "is invocable to protect the innocent,

never to promote an injustice." *Ibid.* (quoting *Nischne, supra,* 116 *N.J.Eq.* at 308, 173 *A.* 341).

In this matter, although we reach the same conclusion as the Appellate Division—that *Integrity* permits the Trust's claims—we do not adopt the panel's reasoning, which was based on equitable fraud. Instead, we reject KPMG's assertion that *Integrity* stands for the proposition that only an auditor who actively participated in the corporate fraud can be barred from raising the imputation defense. Although the complaint in *Integrity* alleged that the defendant auditors had "active[ly] participat[ed]," *id.* at 488, 573 *A.*2d 928, in concealing the corporation's true economic state, negligence and fraud claims had been brought as well, *id.* at 488, 573 *A.*2d 928. In finding that imputation did not bar the liquidator's claims, the court drew no distinction between negligent conduct on the one hand and fraudulent conduct on the other. *See id.* at 506–07, 573 *A.*2d 928. Further, in its holding the panel was careful not to establish "active participation" as the standard, but instead stated that the defense is not available "to one who contributed to the misconduct." *Id.* at 506, 573 *A.*2d 928.

### B.

The dissent states that under our holding, "for all practical purposes, the imputation defense ... no longer exists." *Post* at 395, 901 *A.*2d at 897. That is simply not the case. As noted, the imputation defense exists to protect innocent third parties from being sued by corporations whose agents have engaged in malfeasant behavior against those third parties. *See Nischne, supra,* 116 *N.J. Eq.* at 308, 173 *A.* 341. Accordingly, the imputation defense properly applies to prevent suits by a principal against a third party in instances where an agent of the principal has defrauded the third party. *Compare Hollingsworth, supra,* 125 *N.J.Eq.* at 211, 4 *A.*2d 291 ("If any ... agent acting within the general scope of his powers acquires knowledge of a particular fact while committing a fraud upon a third person in a matter pertaining to the business of the corporation ... the corporation

will be imputable with such knowledge, as well as with knowledge of the fraud . . . ." (citations and quotation marks omitted)), *with Hickman v. Green,* 123 *Mo.* 165, 27 *S.W.* 440, 443 (1894) ("When the agent is in collusion with a third person to defraud the principal, the latter will not be responsible for the knowledge of the agent in relation to such fraud."). Our holding does nothing to change that rule.

However, this matter does not present the typical circumstance for which the imputation defense was designed because PCN's agents did not directly defraud an innocent third party. They defrauded the corporation and its creditors instead. In that respect, KPMG is not a victim of the fraud in need of protection. Further, KPMG had an independent contractual obligation, at a level defined by its agreement with PCN, to detect the fraud, which it allegedly failed to do. Allowing KPMG to avoid liability for its allegedly negligent conduct would not promote the purpose of the imputation doctrine—to protect the innocent. Therefore, by not extending the imputation doctrine to this context, we do not eviscerate it, as the dissent argues, but rather, we refuse to stretch it to its breaking point. *Cf. In re Jack Greenberg, Inc.,* 240 *B.R.* 486, 508 (Bankr.E.D.Pa.1999) ("[W]hile the imputation doctrine may be applied in auditor liability cases, the doctrine was not crafted with that purpose in mind.").

■   In sum, we hold that the Trust's suit is not barred because one who contributed to the misconduct cannot invoke imputation. We therefore conclude that a claim for negligence may be brought on behalf of a corporation against the corporation's allegedly negligent third-party auditors for damages proximately caused by that negligence.[2]

---

[2] The presence of auditor negligence arguably could be called an "exception" to the imputation doctrine. However, *Integrity, supra,* refers to estoppel, that is, the accountant's culpability "would estop it from raising the defense of imputation." 240 *N.J.Super.* at 506, 573 A.2d 928. As a practical matter, we may consider negligence to be both an exception to the imputation doctrine and a ground for estoppel. In any event, the effect is the same.

## VI.

We turn our attention from the question whether a claim for negligence against an auditor can be brought to the issue of who may bring that claim. For the reasons expressed below, we hold that in this case the Trust, as the representative of PCN's shareholders, may bring this action.

### A.

The seminal case on the issue is *Cenco, supra,* in which the Seventh Circuit, interpreting Illinois law, held that allegedly negligent auditors could invoke imputation as a defense when corporate management committed fraud that benefited the corporation. 686 *F.*2d at 456. In that case, the corporation's highest-level managers intentionally over-reported the value of inventory, artificially inflating the corporation's stock price and enabling it to borrow money at unjustifiably low rates. *Id.* at 451. The independent auditor either failed to uncover the fraud or failed to report it. *Ibid.* When the fraud was finally detected, the corporation's stock price plummeted, and a class of shareholders sued the corporation, its managers, and the auditor for securities violations, fraud, and negligence. *Ibid.*

The Seventh Circuit rejected the "extreme position" that an employee's fraud is always attributable to the corporation, reasoning that such a position "would exonerate auditors from all liability for failing to detect and prevent frauds by employees of the audited company." *Id.* at 454. "Auditors are not detectives hired to ferret out fraud, but if they chance on signs of fraud they may not avert their eyes—they must investigate." *Ibid.* In deciding whether imputation should bar the shareholder suit, the court looked to tort law principles, rather than to rules of agency, because tort law is designed to "compensate the victims of wrongdoing and to deter future wrongdoing." *Id.* at 455. Applying those principles, the court determined that a judgment in favor of the corporation would be "perverse from the standpoint of compensating the victims of [the] wrongdoing," because the culpable

corporate officers owned stock and would receive a pro rata share of compensation from the auditor. *Ibid.* In addition, the court denied relief because other investors who held stock during the officers' fraudulent activity, although "innocent in a sense," were responsible for electing the board of directors that managed the corporation during the fraud. *Ibid.*

Turning to considerations of deterrence, the Seventh Circuit recognized that auditor liability would create an incentive for auditors to be "more diligent and honest in the future." *Ibid.* Nonetheless, considering the question in the context of a contributory negligence framework, which applied in Illinois at the time, the court found that shareholders of a corrupt enterprise should not be allowed to shift the entire responsibility for fraud to the auditor because "their incentives to hire honest managers and monitor their behavior will be reduced." *Ibid.* The court refused to permit the company to recover because, during the fraud, the corporation had large corporate shareholders who were in a position to watch over the firm's operations but who "were slipshod in their oversight." *Id.* at 456.

Finally, the court examined whether the fraudulent acts of management benefited or harmed the corporation. *Ibid.* The court stated:

> Fraud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims; their equities vis-à-vis a careless or reckless auditor are therefore strong. But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud.
>
> [*Ibid.*]

Concluding that the malfeasant acts of management were for the benefit of the company, the court barred the corporation's suit against the auditor. *Ibid.*

One year later, in *Schacht v. Brown*, 711 *F*.2d 1343 (7th Cir.), *cert. denied*, 464 *U.S.* 1002, 104 *S.Ct.* 509, 78 *L.Ed.*2d 698 (1983), the same circuit revisited the issue of auditor liability and reached a different result. In *Schacht*, the officers and directors of an insurance corporation allegedly arranged a fraudulent scheme to

issue "extraordinarily high-risk insurance" policies without retaining sufficient funds to cover possible claims. *Id.* at 1345. When the corporation became insolvent, a liquidator was appointed to manage its affairs and to initiate any actions belonging to the bankruptcy estate. *Id.* at 1346. The liquidator eventually sued the auditor for negligently failing to discover the fraud. *Ibid.* Citing *Cenco*, the auditor argued that the liquidator, as the corporation's successor-in-interest, "stand[s] in the shoes" of the corporation and only can advance those claims that the corporation could advance directly. *Ibid.* Therefore, the corporate agents' fraud was imputable to the liquidator in the same way that it was imputable to the corporation. *Ibid.* The auditor also contended that the corporate agents' fraud benefited the corporation by enabling it to remain in business, even though the corporation was "past the point of insolvency." *Id.* at 1348.

The Seventh Circuit rejected the auditor's reliance on *Cenco*, finding *Cenco* factually distinct from the case at bar. The court first rejected the argument that the fraud benefited the corporation, explaining that

> the fact that [the corporation's] existence may have been artificially prolonged pales in comparison with the real damage allegedly inflicted by the diminution of its assets and income.... We do not believe that such a Pyrrhic "benefit" to [the corporation] is sufficient to even trigger the *Cenco* analysis which seeks to determine the propriety of imputing to the corporation the directors' knowledge of fraud.
> [*Ibid.*]

The *Schacht* court also found *Cenco* distinguishable on its facts. In *Cenco,* any recovery from the auditors would have benefited the corporation's shareholders, whereas in *Schacht* any recovery would benefit the corporation's creditors and policyholders. *Ibid.* The court explained that in "*Cenco,* we undertook a two-pronged analysis to determine whether ... imputation should occur: whether a judgment in favor of the plaintiff corporation would properly compensate the victims of the wrongdoing, and whether such recovery would deter future wrongdoing." *Ibid.* First, the court found that any recovery would compensate only the victims of the wrongdoing because the creditors and policyholders were

"entirely innocent parties." *Ibid.* The court also found no evidence that the wrongdoing officers of the corporation would benefit from a successful recovery against the auditor, thus avoiding the " 'perverse' compensation pattern" that the court found objectionable in *Cenco. Ibid.* (quoting *Cenco, supra,* 686 *F.*2d at 455). Second, addressing deterrence, the court determined that because the shareholders would be the last to recover under the liquidation statute, "permitting recovery in this case would not send unqualified signals to shareholders that they need not be alert to managerial fraud since they may later recover full indemnification for that fraud from third party participants." *Id.* at 1349.

Following in the footsteps of *Schacht,* other jurisdictions have distinguished *Cenco* and not applied the imputation defense in cases in which recovery against allegedly negligent third parties would inure to the benefit of creditors of the insolvent corporation. *See, e.g., In re Phar-Mor, Inc. Sec. Litig.,* 900 *F.Supp.* 784, 787 (W.D.Pa.1995) (rejecting application of imputation defense in summary judgment motion against auditors for negligence, misrepresentation, outrageous conduct and breach of contract when any recovery under litigation trust would "inure to the benefit of the secured and unsecured creditors having an interest in the trust"); *Welt v. Sirmans,* 3 *F.Supp.*2d 1396, 1402–03 (S.D.Fla.1997) (holding that imputation defense does not bar bankruptcy trustee from bringing "a claim for damages stemming from a third party's negligent failure to discover a fraud perpetrated by such corporation's officers and directors," when such action benefits corporation's creditors); *Greenberg, supra,* 240 *B.R.* at 489, 517–18 (permitting claims for negligence, fraud, negligent misrepresentation, and aiding and abetting fraud against auditor where proceeds of recovery would benefit creditors). Like *Schacht,* those courts have reasoned that allowing creditors to recover against a negligent auditor would serve the objectives of tort liability because, unlike *Cenco,* neither the fraudulent actors nor the corporation's shareholders would benefit from a recovery.

## B.

Although we accept *Cenco's* premise that tort principles are a useful guide in determining when the imputation defense may be invoked, we decline to follow *Cenco's* conclusion that the imputation defense should prohibit all shareholder lawsuits against auditors who were allegedly negligent within the scope of their engagement. We note that *Cenco* was decided under Illinois law, and so we "write on a clean slate" in addressing the issue under New Jersey law. *Schacht, supra,* 711 *F.*2d at 1347. Further, *Cenco* was decided over twenty years ago. Events since then suggest that auditors must be more alert to corporate fraud and, where appropriate, courts should take steps to protect and safeguard the public from that fraud.

We first address *Cenco's* reasoning that shareholders should not be permitted to recover against allegedly negligent auditors because such a recovery would conflict with the tort principle of only compensating victims. As the circuit recognized in *Cenco,* if the veil of imputation is completely lifted there will be occasions when offending officers and undeserving board members, as shareholders of the corporation, will be in a position to recover from a negligent auditor. Simply put, under our laws, a shareholder cannot and should not benefit from his or her own wrongdoing. But we should not punish the many for the faults of the few. Allowing the impropriety of some shareholders—who, as directors and officers, perpetrated or did not prevent the fraud— to bar all shareholders from recovery is unfair and improper. Indeed, although shareholders elect the board of directors, that does not necessarily make them culpable in the fraud. In large corporations only shareholders with a substantial ownership of stock may have the ability to affect board elections. Accordingly, we find that the imputation doctrine should not bar suit by all shareholders.

Our conclusion, however, is subject to certain limitations. We agree with the dissent that "no one should profit from a

fraud he himself perpetrated." *Post* at 403, 901 *A.2d* at 902. Because the imputation defense only protects the innocent and not the guilty, shareholders seeking to recover must themselves be "innocent" of the wrongdoing. As such, imputation may be asserted against those shareholders who engaged in the fraud. If a trier of fact finds that a shareholder participated in the fraud, that shareholder will not receive any recovery. Further, imputation may be asserted against those who, by way of their role in the company, should have been aware of the fraud. For example, those officials, including directors and officers, who own stock and whose position enables them to detect or prevent fraud, cannot escape responsibility if they avert their eyes. Finally, there may be occasions in which shareholders, by virtue of their ownership of a large portion of stock, have the ability to conduct oversight of the firm's operations. Evidence of such ability, in appropriate cases, may reduce or limit an accountant's liability for negligence. In so holding, we properly effectuate the tort principle of compensating the victims of wrongdoing by allowing only "innocent" shareholders to recover.[3]

We also disagree with *Cenco* that imputation must be applied to shareholder suits to deter future such wrongdoing. In *Cenco, supra,* the circuit reasoned that "if the owners of the corrupt

---

[3] The task of separating those shareholders who should be barred by the imputation defense from those that should not is generally a question of fact that can be addressed at the trial level and, more particularly, is a function of the discovery process and motion practice. For example, KPMG is entitled to a list of shareholders represented by the Trust and, based on that list, can assert the imputation defense against appropriate shareholders. If it is revealed that the Trust represents Mortell and Wraback, then KPMG would be entitled to raise the imputation defense to preclude any recovery by those individuals. Similarly, the auditors may claim that shareholders who own large blocks of stock knew or should have known of the misconduct, in which case evidence can be presented concerning those shareholders' knowledge.

Trial courts thus will be able to address these matters on a case-by-case basis until experience presents an opportunity for further guidance. Finally, this process also may have the salutary effect of encouraging plaintiff groups to ensure that they represent only the appropriate shareholders, thereby saving time and resources.

enterprise are allowed to shift the costs of its wrongdoing entirely to the auditor, their incentives to hire honest managers and monitor their behavior will be reduced." 686 *F*.2d at 455. However, the nature of today's corporations makes it increasingly unlikely that shareholders of large corporations have the ability to effectively monitor the actions of corporate officials. *See, e.g.*, A.C. Pritchard, *O'Melveny & Myers v. FDIC: Imputation of Fraud and Optimal Monitoring*, 4 *Sup.Ct. Econ. Rev.* 179, 197 (1995) ("[*Cenco*] suggests a non-imputation rule would undercut shareholder deterrence. But shareholders are not realistically in any position to monitor their managers' conduct toward third parties. . . ."). As a result, many investors play a passive role in the oversight of a firm's day-to-day operations, relying instead on third-party professionals to assist in monitoring the corporation's officers and directors. *See generally* Sharon Tomkins, Note, *Tightening Gatekeeper Liability: Should Officers' and Directors' Wrongdoing be Imputed to the Corporation in Suits Against Third–Party Professionals?*, 69 *S. Cal. L.Rev.* 1883 (1996). Indeed, third-party auditors are specifically retained for the task of monitoring corporate activity. Id. at 1909. In contrast, shareholders cannot reasonably be expected to scrutinize corporate books.

Further, our focus cannot be limited only to deterring wrongdoing on the part of corporate shareholders. We also must seek to deter wrongdoing on the part of corporate auditors. *See Greenberg, supra*, 240 *B.R.* at 507 ("Unlike traditional imputation cases, in auditor liability cases . . . the defendant is not an innocent party."). If we allow imputation to shield a negligent auditor from the consequences of its actions, we will force shareholders to shoulder the entire loss—a result that violates principles of fairness and equity. Although the auditor in this matter was not accused of committing fraud, the Trust claims that the auditor negligently failed to detect the corporate fraud, thereby violating its contractual obligation to the corporation and allowing the fraud to remain undetected. By way of illustration only, in one allegation the Trust maintains that KPMG failed to comply with GAAS

by not verifying deposit of a check for $3.5 million that was PCN's largest single source of income for 1996. In circumstances such as these, where an auditor allegedly failed to comply with applicable professional standards, we fail to see how the auditor can be deemed to be an innocent party deserving of protection. To deter future such wrongdoing, we will not indiscriminately provide a safe haven for allegedly negligent conduct.

We observe, further, that *Cenco, supra,* interpreted Illinois law, which, at the time of that decision, applied contributory negligence in negligence cases. 686 *F*.2d at 454. In contrast, New Jersey utilizes a comparative negligence standard. *See N.J.S.A.* 2A:15–5.1. The application of comparative negligence will provide the corporation and its shareholders good reason to actively supervise managers while simultaneously encouraging auditors to carefully monitor the transactions of the corporation and its agents. It also will ensure that an auditor is liable only for as much of a plaintiff's losses as are directly attributable and proportionate to the auditor's negligence. Auditors cannot and should not be held liable for all corporate accounting fraud. To the contrary, in 1995, the Legislature enacted *N.J.S.A.* 2A:53A–25, which provides greater protections for accountants by limiting their exposure to liability for damages for negligence to third parties. *See E. Dickerson & Son, Inc. v. Ernst & Young, LLP,* 179 *N.J.* 500, 502–03, 846 *A.*2d 1237 (2004). The Legislature, however, intended to protect the profession, not immunize it. An auditor's professional duty to its corporate client requires the auditor to comply with GAAS and GAAP, which are designed, at least in part, to detect fraudulent activity. Although auditors cannot be expected to catch every instance of corporate fraud, we can require that they answer to claims when they fail to detect fraud that a reasonably prudent auditor acting within the scope of its engagement would uncover. Ultimately, our goal is to establish rules of law that discourage fraud and negligence, not encourage them.[4]

---

[4] The principles set forth in this Court's decision in *Frugis v. Bracigliano,* 177 *N.J.* 250, 827 *A.*2d 1040 (2003), should guide the apportionment of fault in this

Finally, we must address the oft-drawn distinction in imputation cases involving whether the corporate agent's fraud was adverse to or for the benefit of the corporation. Originating with *Cenco, supra,* 686 *F.*2d at 456, courts have distinguished between "fraud on behalf of the corporation" and "fraud against it," allowing the imputation defense when a corporate agent's fraud is "on behalf of" or for the benefit of the corporation. In such cases, however, there can be difficulty in differentiating between whether the malfeasant conduct benefits or harms the corporation. *See* Debra A. Winiarsky, *Litigating an Accountant's Liability Suit–Contributory Negligence and Third Party Practice,* SC46 *A.L.I.-A.B.A.* 315, 326 (1998) ("[A]lmost any situation involving management fraud can be seen as either aimed at harming or benefiting the company."). As does *Schacht, supra,* 711 *F.*2d at 1348, we find that inflating a corporation's revenues and enabling a corporation to continue in business "past the point of insolvency" cannot be considered a benefit to the corporation. *See also In re Investors Funding Corp.,* 523 *F.Supp.* 533, 541 (S.D.N.Y.1980) ("A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it."). In this matter, there are allegations that support a finding that the fraudulent acts of Mortell and Wraback, high-ranking managers of PCN, did not benefit the corporation, but rather, led to the corporation's ultimate demise. According to the Trust's complaint, after the discovery of PCN's improper accounting practices, "PCN continually operated at a cash flow deficit and was in default on its bank debt," forcing the corporation to file for bankruptcy.

■ Even if the fraud of Mortell and Wraback could be considered a "benefit" to the corporation, the limited record before the Court precludes us from definitively making such a determina-

---

circumstance. As Justice Albin explained in *Frugis,* "the jury [should] first determine who, if anyone, is at fault among the parties, and then ... determine the total damages award. Last, the jury should be charged on apportionment of damages and determine the allocation of fault." *Id.* at 283, 827 A.2d 1040.

tion. Moreover, any benefit would not be a complete bar to liability but only a factor in apportioning damages. *See Allard v. Arthur Andersen & Co.*, 924 *F.Supp.* 488, 495 (S.D.N.Y.1996) (finding that "notwithstanding the adverse interest exception" "imputation would not necessarily operate as a complete bar to [trustee's] negligence and malpractice claims" in jurisdictions that apply comparative negligence); *Cenco, supra,* 686 *F.*2d at 456 (stating that "stockholders should not be allowed to escape *all* responsibility for such a fraud") (emphasis added).

Accordingly, we conclude that tort principles do not require that the imputation defense bars shareholder suits against allegedly negligent auditors. To the contrary, those principles, applied in light of the nature of today's corporations, require that such suits be permitted and that negligent auditors be held responsible for their wrongdoing.

## C.

In so holding, we note that KPMG's liability must be defined by the scope of the engagement it entered into with PCN. As such, we disagree with the dissent that by allowing a claim for negligence, the Court "ignores the basis of the bargain between PCN and KPMG and, instead, imposes its own view of the services an auditor is retained to perform." *Post* at 403–04, 901 *A.*2d at 902. The first element of negligence is duty. Ultimately, the duty owed to another is defined by the relationship between the parties. Here, the relationship between KPMG and PCN is the contractual obligation for KPMG to conduct auditing services for PCN. For example, KPMG attached the following opinion to PCN's 1995 Form 10–K, which was directed to PCN's Board and stockholders:

> We have audited the consolidated financial statements of Physician Computer Network, Inc. and subsidiaries as of December 31, 1995 and 1994, and the related consolidated statement of operations, changes in shareholders' equity (deficiency), and cash flows for each of the years in the three-year period ending December 31, 1995. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express

an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Physician Computer Network, Inc. and subsidiaries....

■ Any suit brought in negligence against KPMG must be based on the scope of that, or related, understandings and agreements to determine whether KPMG violated any duty. That review includes, but is not limited to, the engagement letter and GAAS. *Cf. N.J.A.C.* 13:29–3.5 (stating that auditor "shall not permit [his/her] name to be associated with financial statements ... unless [he/she] has complied with [GAAS or Statements on Auditing Standards issued by the American Institute of Certified Public Accountants]"). Here, the complaint alleges that

[c]ontrary to the representations in its audit opinions, KPMG's audits of PCN's 1995 and 1996 financial statements were not conducted in accordance with GAAS. KPMG certified PCN's 1995 financial statements, even though PCN's 1995 books and records were in such disarray that, when the irregularities in PCN's financial statements came to light, another ... auditing firm ... was unable to recreate accurate financial statements for that period.

Ultimately, the issues to be resolved are whether KPMG was negligent in performing its agreed duties and to what extent such negligence proximately contributed to the damages suffered by plaintiff. In so providing, we do not re-write the agreement; we effectuate it.

Nor do we see how the dissent's application of the imputation doctrine to this context would further its goal of holding KPMG liable based on the scope of its engagement. According to the dissent, KPMG only can be held liable if it "actively participated in the fraud." *Post* at 397, 901 *A.*2d at 898. Under such a scheme, KPMG would be excused if it negligently failed to effectuate the

scope of its engagement by not following GAAS or GAAP when it certified PCN's annual financial statements. Further, KPMG would receive a free-pass even if it could be shown that the company violated the terms of its engagement by recklessly disregarding a substantial risk that the statements that it was certifying were indeed fraudulent. As becomes clear, the dissent's analysis has nothing to do with effectuating the contractual agreement between KPMG and PCN. Rather, it simply would apply the imputation doctrine in the corporate auditing context and require evidence of active participation by auditors in the fraud before shareholders can bring suit—a notion that we find unsupported by our case law, agency principles, and tort jurisprudence.

Finally, the dissent asks us to adopt "the thoughtful, reasoned and comprehensive opinion" by Judge Debevoise in a federal case against KPMG. *Post* at 404, 901 *A.*2d at 902. We do not doubt the persuasiveness of that opinion. However, the allegations in that matter were based on violations of Section 10(b) of the Securities and Exchange Act of 1934 and Section 11 of the Securities Act of 1933. This appeal, although grounded in similar facts, involves entirely different claims based on state law. Because this Court is the final arbiter of such claims, reference to that decision does not answer the question before this Court.

## VII.

We thus conclude that when an auditor is negligent within the scope of its engagement, the imputation doctrine does not prevent corporate shareholders from seeking to recover. A limited imputation defense will properly compensate the victims of corporate fraud without indemnifying wrongdoers for their fraudulent activities. To the extent that shareholders are innocent of corporate wrongdoing, our holding provides just compensation to those plaintiffs.

With that conclusion in mind, we return to the procedural posture of this matter. We agree with the Trust that the pleadings do not support the availability of the imputation defense in

this appeal. *See, e.g., In re Sec. Investor Prot. Corp., supra,* 274 *B.R.* at 782 (concluding that "*Cenco* type issues cannot be resolved on a motion for dismissal"). Even at this early stage, the complaint, fairly read, presents a colorable claim that KPMG, by negligently failing to discover inaccuracies in PCN's financial records, contributed to the misconduct that led to PCN's bankruptcy. If developed in discovery, the facts may establish those allegations. Conversely, at that time, KPMG may move for summary judgment if the evidence demonstrates that no "rational factfinder" could conclude that the audits were negligently conducted. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). Until discovery occurs, however, KPMG does not deserve the same protection as an innocent, uninvolved third party. We therefore affirm the Appellate Division decision, as modified, and remand this matter to the trial court for discovery to allow the Trust an opportunity to present evidence to support its claims that KPMG was negligent and that such negligence proximately caused damage to the corporation. Our opinion does not express, and is not intended to express, any opinion concerning the liability of defendant in this matter.

Justice LaVECCHIA, dissenting.

Although I agree with most of Justice Rivera–Soto's dissenting opinion, I write separately in dissent because I differ from my colleague in that I believe that it may be appropriate to deny an imputation defense to a litigant based on a theory of negligence in certain circumstances. In other words, I would not foreclose consideration of extending a carve-out from the imputation defense based on certain instances of recklessness or gross alleged professional negligence. That said, I agree that this matter properly was dismissed at the pleading stage.

The majority is altering our case law to include negligence as among the torts that will justify a carve-out from the application of the strict rule of the imputation defense. That approach may be appropriate for some negligent behavior, depending on the extent

of the dereliction. *In re Integrity Ins. Co.*, 240 *N.J.Super.* 480, 573 *A.2d* 928 (App.Div.1990), already has indicated our courts' willingness to move from a pure, or "absolutist" rule in respect of the imputation defense that "if it is your fraud, you cannot recover."[1] We allow a carve-out from that position for suits against third parties who were active participants in the fraud. Recklessness or gross negligence may be sufficiently close to knowledgeable or intentional participation in the wrongdoing and, therefore, I would be willing to consider the possibility that that conduct may be appropriate for expansion of the carve-out. However, to the extent that the majority suggests that simple negligence will do, it goes too far in the signal that the Court sends and, therefore, I cannot join in the Court's holding.

In respect of the procedural posture in which the question is presented, I must add that it would have been my preference not to decide whether to extend the current carve-out from the imputation defense until a properly pled complaint and developed record brought a cause of action based on recklessness or gross negligence before the Court. However, because the majority has elected to recognize a new rule of law that would deny imputation of wrongdoing in favor of any accountant who may have negligently audited the books of the wrongdoer, I cannot wait to make my decision. I can only state my present view that I do not endorse the wholesale adoption of simple negligence as the basis for permitting a carve-out from application of the imputation defense.

Moreover, given the different standard of negligence that I would require in order to consider expansion of the carve-out, I also cannot agree with the determination to remand this matter for discovery. Normally, we are loath to dismiss at the pleading stage because we do not want to deny a litigant an opportunity to flesh out a complaint through discovery. *See R.* 4:5–7 (stating

---

[1] *See Cenco, Inc. v. Seidman & Seidman*, 686 *F.2d* 449, 454 (7th Cir.1982) (recognizing that there is "[an] extreme position" that "employee's fraud is always attributed to the corporation....").

that pleadings are to be liberally construed). Here, however, I do not have that concern because discovery on these same allegations has taken place before.

As noted by the majority, a similar action was filed in federal court against KPMG by a group of shareholders.[2] Their complaint alleged that KPMG acted "with scienter" and "knowledge of the falsity and misleading nature of the statements contained in its unqualified audit reports, and in reckless disregard of the true nature of its audits." Further, that complaint's assertions were based, as is the instant complaint, purely on circumstantial evidence that was found to be insufficient to state a cause of action for intentional, knowing, or reckless behavior by the defendant auditors. In granting KPMG's motion to dismiss, Judge Debevoise noted that "[i]t is sufficient ... for a plaintiff to plead scienter by alleging facts 'establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute [strong] circumstantial evidence of either reckless or conscious behavior.' If those requirements are not met, the complaint shall be dismissed." *Wis. Inv. Bd. v. KPMG*, No. 01–751 (D.N.J. Jun. 18, 2001) (citations omitted). Applying that standard, the court found that plaintiffs had made "only vague references to 'accounting irregularities' " with respect to the 1995 audit. Moreover, there was "no allegation that KPMG acted with intent to defraud, either in the form of motive and opportunity or reckless disregard or conscious behavior."

Specifically, in respect of the G. Barry transaction, the court found that "there was no allegation that KPMG knew that the transaction was fictitious." There was "no allegation of facts constituting strong circumstantial evidence of conscious misbehavior or recklessness by KMPG. [Plaintiffs'] allegations that KPMG violated GAAP and GAAS without more, are insufficient to state a

---

[2] Although those claims involved violations of federal securities law, the claims in the Trust's complaint in this matter recited the identically pled facts as are found in the federal complaint.

... claim." The court concluded that much greater specificity in the complaint was required under the federal rules of civil procedure given that plaintiffs had full discovery available to them from a prior action involving PCN. Indeed, plaintiffs "admit[ted] to having access to documents produced in the prior PCN litigation and information provided by Mortell and Wraback—PCN's officers serving as the contacts to KPMG for the audits." Thus, these same allegations of knowing, conscious, or reckless participation in the wrongdoing have been weighed, measured, and found lacking in two prior litigations.

In the wake of those circumstances, the instant complaint had to have pled something more than worn allegations from prior proceedings to overcome a defendant's motion to dismiss based on an imputation defense. To me, the failure in pleading is dispositive in these unique circumstances involving multiple prior litigations on the same alleged facts. In the context of a novel theory that a shareholder's negligence action against a third-party auditor should be carved out from the application of the imputation defense, more was required for this action to avoid dismissal. In the end, Judge Debevoise's analysis and conclusion is instructive. Just as the federal action was dismissed because neither recklessness nor other evidence of conscious participation in the wrongdoing was shown, those same standards remain unsatisfied by the pleadings in this matter. In other words, absent any credible claim of recklessness, gross negligence or other similar culpable conduct by the auditor that contributed to the wrongdoing, defendants were entitled to a dismissal. Thus, there was no basis presented on which I would consider expanding the carve-out from the imputation defense. The defendant, therefore, was entitled to the defense and the defense is all-or-nothing.

Accordingly, I respectfully dissent.

Justice RIVERA–SOTO, dissenting.

In the inevitable casting about for redress that follows the discovery of inflated financial results that falsely improve a corpo-

ration's performance and worth, any and all who are thought to have contributed to that harm become fair game. Along with the culpable corporate officers, the auditors who attest to the corporation's financial statements usually are among the primary targets against whom such redress is sought, purportedly due to their negligent failure to discover and expose those culpable corporate officers. In that respect, this case is no different from those that now are seared into the collective consciousness.

This case, however, differs in two fundamental respects from those cases. First, unlike the instances where auditor misdeeds were part and parcel of the wrongdoing committed, in this case KPMG relied—as it had the right to do—on the representations made to it by Mortell and Wraback, the persons selected by PCN as its gatekeepers for accounting information, yet who also were the corrupt wrongdoers and masterminds of the fraud here. Second, it was KPMG itself that ultimately discovered and exposed Mortell's and Wraback's wrongdoing. Despite those incontrovertible facts evident on the face of the complaint, the majority concludes that this case cannot be disposed of on motion and must return to the Law Division for additional proceedings because, in the majority's view, "KPMG does not deserve the same protection as an innocent, uninvolved third party." *Ante,* 187 *N.J.* at 385, 901 *A.*2d at 890 (2006). Because that view distorts the foundational concept undergirding the imputation defense in this State, thereby jettisoning established principles of agency liability; because it ignores the reasonable reliance of the auditors on the terms of the contract that defined this engagement; and because it ignores the import of a decision rendered by a federal court in a substantially identical case, I dissent.

## I.

I am in substantial agreement with the majority's recitation of the facts here.[1] I add, however, the following.

---

[1] This matter comes to us on defendant's *Rule* 4:6–2(e) motion to dismiss the complaint for failure to state a claim upon which relief can be granted.

In March 2002, after the action in *State of Wis. Invest. Bd. v. KPMG, LLP*[2] was dismissed, and under the auspices of the reorganization plan approved by the United States Bankruptcy Court for the District of New Jersey, PCN and several of its affiliated entities entered into a litigation trust agreement that contributed to the Trust any claims PCN may have had against KPMG.[3] Based on that agreement, the Trust filed the action presently before us, alleging four discrete causes of action against KPMG: negligence, negligent misrepresentation, breach of con-

Therefore, we "examin[e] the legal sufficiency of the facts alleged on the face of the complaint [and we] search[ ] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, [where] plaintiffs are entitled to every reasonable inference of fact." *Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 *N.J.* 739, 746, 563 *A.*2d 31 (1989) (citations and internal quotation marks omitted). In so doing, our "examination ... should be one that is at once painstaking and undertaken with a generous and hospitable approach." *Ibid.* However, my lack of quarrel with the majority's factual recitations should not be read as an endorsement of the majority's commentary on the facts as a whole.

[2] That action and its import to this case are more particularly addressed below. *See infra,* 187 *N.J.* at 371–72, 901 *A.*2d at 881–82 (2006).

[3] Specifically, the March 2002 litigation trust agreement provides that PCN and its affiliated corporate entities "absolutely and irrevocably grant, assign, transfer, convey, and deliver to the [Trust] and its successors, ... all right, title and interest of [PCN and its corporate affiliates] in and to any and all Litigation Claims, the Other Assets and the Cash deposited herewith, and the proceeds therefrom[.]" The agreement defines "Litigation Claims" as all claims "[a]gainst KPMG LLP and all other appropriate parties for accounting malpractice, breach of contract and any and all other appropriate causes of action arising out of KPMG's audits of [PCN's] financial statements." The agreement further defines "Other Assets" as "[a]ny and all tax refunds, reserves, etc. of [PCN] remaining after [PCN's] liquidation and dissolution." Finally, the agreement quantifies "the Cash deposited herewith, and the proceeds therefrom" as $750,000.

As an assignee, the Trust stands in PCN's stead and, hence, has no rights greater than those of its assignor PCN. *Borough of Brooklawn v. Brooklawn Hous. Corp.*, 129 *N.J.L.* 77, 79, 28 *A.*2d 199 (E. & A.1942) ("[I]t is fundamental that the assignee can have no greater rights than the assignor and can recover no more than the assignor could have recovered....") (citing *Boyd v. Brown,* 115 *N.J.L.* 611, 181 *A.* 142 (E. & A.1935)).

tract, and breach of fiduciary duty. KPMG responded by a motion, pursuant to *Rule* 4:6–2(e), seeking dismissal of the Trust's claims for failing to state a claim upon which relief can be granted. KPMG alleged that PCN could not recover against KPMG because KPMG reasonably relied on the actions of PCN's own corporate officers and did not actively participate in Mortell's and Wraback's fraud scheme. Stated in terms that place the issue in proper focus, KPMG asserted that the imputation defense barred the causes of action asserted by the Trust.

The trial court granted KPMG's motion and dismissed the Trust's complaint with prejudice. After concluding that the Trust was the unquestioned "successor in interest" to PCN,[4] the trial court reasoned that

> if an officer or agent acting within the general scope of powers requires knowledge of a fact while committing a fraud upon a third person in a matter pertaining to the business of the corporation, although the fraud is perpetrated for his own benefit, the corporation will be imputable [with] such knowledge, as well as with knowledge of the fraud, especially where it ratifies the transaction.

Relying on both *Hollingsworth v. Lederer,* 125 *N.J.Eq.* 193, 4 *A.*2d 291 (Ch.1936), *aff'd,* 125 *N.J.Eq.* 211, 4 *A.*2d 291 (E. & A.1939), and *In re Integrity Ins. Co.,* 240 *N.J.Super.* 480, 573 *A.*2d 928 (App.Div.1990), the trial court found that

> there can be no doubt in the Court's mind that the doctrine of imputation is indeed a viable doctrine in New Jersey. And that [it is] incumbent upon the parties to demonstrate that there has been a material participation by the third party, a material form of culpability to the extent that it would estop that third party from raising the defense of imputation.
>
> . . . .
>
> The review of the record is satisfactory to lead this Court to conclude and to find no evidence of any material fault, accounting irregularity, participation of [KPMG] in the fraudulent conduct of these senior participants that would in any way be deemed sufficient to estop the rule of imputation. . . .
>
> There has not been demonstrated [to] the Court from the evidentiary material in [the] record that [KPMG's] culpability was indeed allegedly material, significant, and contributory to the falsity and financial irregularities that were ultimately determined to be found subsequently by other parties.

---

[4] That conclusion is not challenged by the Trust and, regardless, is well founded in the instrument that created the Trust.

In an unpublished per curiam decision, the Appellate Division reversed. The panel held that "[n]egligence, negligent misrepresentation, and breach of contract, as well as legal fraud, surely can be culpable conduct that 'contributed to the misconduct of another' " and faulted the trial court for "read[ing] *Integrity* too narrowly when it essentially held that only legal fraud by the third party would constitute sufficiently culpable conduct to defeat the imputation defense." Instead, the panel relied on a theory of equitable fraud, a theory of liability nowhere advanced by the Trust—indeed, because of the limited remedy available, one specifically eschewed by the Trust—to defeat KPMG's imputation defense.

As thus supplemented, the facts properly frame the issue before us.

## II.

I address first the majority's new iteration of the imputation defense in this State. As the majority notes, it is unarguably a matter of state law "whether the knowledge of corporate officers acting against the corporation's interest will be imputed to the corporation...." *O'Melveny & Myers v. FDIC,* 512 *U.S.* 79, 83–89, 114 *S.Ct.* 2048, 2053–56, 129 *L.Ed.*2d 67 (1994). *Ante,* 187 *N.J.* at 369, 901 *A.*2d at 881 (2006).[5] The discrete question presented then is whether, and to what extent, New Jersey recognizes the imputation defense.

## A.

Since at least 1916, New Jersey has recognized that

[a] private or a municipal corporation, as a legal entity, cannot itself have knowledge. If it can be said to have knowledge at all, that must be the imputed

---

[5] For that reason, the majority's extensive discussion of federal cases concerning the imputation defense is instructive but not dispositive. *See ante,* 187 *N.J.* at 373–76, 901 *A.*2d at 882–85 (2006).

knowledge of some corporate agent.... [T]he knowledge of the proper corporate agent must be regarded as, in legal effect, the knowledge of the corporation. [*Allen v. City of Millville*, 87 *N.J.L.* 356, 357, 95 *A.* 130 (Sup.Ct.1915), *aff'd*, 88 *N.J.L.* 693, 96 *A.* 1101 (E. & A.1916) (per curiam).]

*Accord Hercules Powder Co. v. Nieratko*, 113 *N.J.L.* 195, 199, 173 *A.* 606 (Sup.Ct.1934) ("[A] corporate body, as a legal entity, cannot itself have knowledge. If it can be said to have knowledge at all, that must be the imputed knowledge of some corporate agent. Knowledge of the proper corporate agent must be regarded as, in legal effect, the knowledge of the corporation.").

The common sense notion that the knowledge of a corporate officer acquired in the course and scope of his employment should be imputed to the corporation itself was later questioned in the context of fraudulent acts by the corporate officer that harmed third parties. In *Hollingsworth v. Lederer*, 125 *N.J.Eq.* 193, 4 *A.*2d 291 (E. & A.1939) (*per curiam*), the Court of Errors and Appeals rejected any such limitation when it explicitly affirmed the following holdings by the Vice–Chancellor:

It has been held that the corporation is affected with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority, and the corporation is charged with such knowledge even though the officer or agent does not in fact communicate his knowledge to the corporation.

This rule appears to apply to vice-presidents, agents or managing agents, or any other officer or agent who acquires such notice or knowledge concerning matters pertaining to his department or scope of authority.

*If any officer or agent acting within the general scope of his powers acquires knowledge of a particular fact while committing a fraud upon a third person in a matter pertaining to the business of the corporation, although the fraud is perpetrated for his own benefit, the corporation will be imputable with such knowledge, as well as with knowledge of the fraud, especially where it ratifies the transaction.*

[*Supra*, 125 *N.J.Eq.* at 206, 4 *A.*2d 291 (citations and internal quotation marks omitted; emphasis supplied).]

The basis for this doctrine is firmly grounded in one of the core principles of our jurisprudence: "it is well settled that, as between two innocent parties, public policy requires that the principal must bear the loss occasioned by the act of his servant." *Stanley v. Chamberlin*, 39 *N.J.L.* 565, 567 (Sup.Ct.1877).

## B.

That said, the reach of the imputation defense is not without bounds: the party invoking the imputation defense cannot be complicit in the fraud perpetrated. In one of its earliest formulations, that limitation was described as "[i]n the law of agency the doctrine of constructive notice is intended to shield from loss *an innocent* party who deals with the agent in good faith. . . ." *Id.* at 568 (emphasis supplied). More recently, the Appellate Division concluded that

> it is clear that the doctrine of constructive notice to the principal is not available to one who contributed to the misconduct sought to be imputed. Therefore, even though an agent (the directors and officers) of a principal [the corporation] may be responsible for falsity, the third party's [the auditors'] culpability, if established, would estop it from raising the defense of imputation. The rule of implied notice is invocable to protect the innocent, never to promote an injustice.
>
> [*In re Integrity Ins. Co.,* 240 *N.J.Super.* 480, 506, 573 *A.2d* 928 (App.Div.1990) (citations, internal quotation marks and internal parentheticals omitted).]

Citing *Integrity,* the Appellate Division here ruled that, because the Trust's "complaint sets forth the facts necessary to support a claim of equitable fraud, as well as negligence and breach of contract on the part of KPMG, the PCN corporate officers' knowledge and participation in the fraud are not imputed to the corporation to bar the action." I disagree for several reasons.[6]

The rule of *Integrity,* as the trial court correctly noted, is broader than the narrow reading given to it by the Appellate Division here. Under *Integrity,* the wrongful acts of a corporate officer are imputed to the corporation he represents and, unless the third party actively participated in the corporate officer's wrongful acts, any action sounding in negligence by the corporation against a third party that relied on the corporate officer is barred.[7] The Appellate Division's reliance on an equitable fraud

---

[6] Although it affirms the result obtained—a reversal of the trial court's dismissal of the Trust's complaint and a remand for further proceedings—even the majority resoundingly disavows the Appellate Division's reasoning. *Ante,* 187 *N.J.* at 371, 901 *A.2d* at 881–82 (2006).

[7] Even the majority concedes that the wrongful acts here were not those of KPMG but those of PCN's senior corporate officers—its agents—who "defrauded the corporation and its creditors[.]" *Ante,* 187 *N.J.* at 372, 901 *A.2d* at 882.

claim as providing the necessary "active participation" by the third party in the culpable corporate officers' wrongful acts must be rejected when, as here, fraud was not alleged by the Trust.[8]

Holding, as the Appellate Division did, that simple negligence and breach of contract claims are sufficient to strip from the third party the right to reasonably rely on representations made by duly appointed and constituted corporate officers in the course and scope of their employment—a reasonable reliance strongly engrained in our case law—eviscerates the doctrine of constructive notice. As the panel would have it, once a claim of equitable fraud is cobbled together, no third party will be entitled to the protection of the imputation defense when the wrongful corporate actor who was engaged in a fraud was the corporate representative with whom the third party interacted. That, simply, is not sensible.

Also, the rule of *Integrity* should not be rendered irrelevant at the motion to dismiss stage, as the majority would have it ripen only in respect of a motion for summary judgment filed after the completion of discovery. According to the majority, "the Trust's suit is not barred because one who contributed to the misconduct cannot invoke imputation." *Ante*, 187 *N.J.* at 372, 901 *A.*2d at 882 (2006). If the safe harbor provided by the imputation defense is denied those whose sole alleged offense was negligence, then, for all practical purposes, the imputation defense no longer exists. The majority's approach renders illusory the imputation defense

---

[8] Although the Appellate Division discerned an equitable fraud claim from the allegations of the complaint, that exercise never was ratified by the Trust for an obvious reason: a claim in equitable fraud only allows for equitable relief, and not money damages. *Foont–Freedenfeld Corp. v. Electro–Protective Corp.*, 126 *N.J.Super.* 254, 257, 314 *A.*2d 69 (App.Div.1973), *aff'd*, 64 *N.J.* 197, 314 *A.*2d 68 (1974) (*per curiam*) ("[I]n an action in which plaintiff relies upon equitable fraud, the only relief that may be sought is equitable relief, such as rescission or reformation of an agreement, and not monetary damages only."). The complaint here—which is 45 pages long and contains 107 charging paragraphs—seeks only "compensatory damages as a result of the wrongs complained of herein" and "costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; ..." Nowhere does the Trust seek any equitable relief.

because it is available only to those who do not need it: those who are entirely without blame. In contrast, the imputation defense traditionally has provided an important bulwark against corporate abuse by requiring that corporations, like individuals, bear responsibility for their statements and actions.

The imputation defense, if it is to have reasoned and continued viability, should protect a third party who relies on the representations of a corporate officer and who does not actively participate in that corporate officer's wrongdoing. When, as here, the issue arises in the context of a motion to dismiss for failure to state a claim upon which relief can be granted, resort should be had to plaintiff's allegations as set forth in the complaint. If, with the particularity required by *Rule* 4:5-8(a), the plaintiff alleges that the third party engaged in a fraud, then that third party should be deemed, for motion to dismiss purposes only, to have actively participated in the fraud and the case should continue. On the other hand, when, as here, the plaintiff only alleges negligence and never alleges that the third party actively participated in the fraud, and when a broad reading of the complaint cannot be so construed, then, for motion to dismiss purposes, the third party should be entitled to the bar to liability provided by the imputation defense.

That statement of the rule is consistent with our prior law, accords with the great weight of authority elsewhere,[9] and is largely informed by strong public policy considerations:

---

[9] *See, e.g., Brown v. Deloitte & Touche LLP*, No. 98 Civ. 6054, 1999 *WL* 269901, at *2 (S.D.N.Y. May 4, 1999) (stating that "whatever damages [the accountant's] alleged negligence may have caused the debtors, the damages are the result of a financial transaction debtor management implemented itself."); *Miller v. Ernst & Young*, 938 *S.W.*2d 313, 316 (Mo.App.1997) (holding that "fraudulent conduct [of the manager of the corporation's most financially important division] is attributable to [the corporation] and precludes plaintiffs, who stand in the shoes of [the corporation], from recovering from [the accountants] for the alleged negligence of [the accountants]."); *Seidman & Seidman v. Gee*, 625 *So.*2d 1, 3 (Fla.Dist.Ct.App.1992) ("Where it is shown, without dispute, that a corporate officer's fraud intended to and did benefit the corporation, to the detriment of

[I]f the owners of the corrupt enterprise are allowed to shift the costs of its wrongdoing entirely to the auditor, their incentives to hire honest managers and monitor their behavior will be reduced. While it is true that in a publicly held corporation such as [plaintiff] most shareholders do not have a large enough stake to want to play an active role in hiring and supervising managers, the shareholders delegate this role to a board of directors, which in this case failed in its responsibility.

[*Cenco Inc. v. Seidman & Seidman*, 686 *F*.2d 449, 455–56 (7th Cir.1982).]

Basic principles of fairness and common sense demand that when, as here, one who already has knowledge of a fraud, either directly or by imputation, and later seeks relief from a third party because of reasonable reliance on the third party's failure to expose the fraud, that claim must be rejected. It has long been the law in New Jersey that "[o]ne who engages in fraud ... may not urge that one's victim should have been more circumspect or astute." *Jewish Ctr. of Sussex County v. Whale*, 86 *N.J.* 619, 626 n. 1, 432 *A*.2d 521 (1981) (holding that rescission of employment contract is proper when employee fraudulently misrepresented his activities during a specified period, hindering discovery of events that reflected poorly on employee). The corollary proposition is equally true. A deception is not ameliorated by another's reasonable reliance, for one who deceives cannot reasonably rely on another's non-culpable reliance on the deceit.

Those principles apply with equal force here. Because the fraud perpetrated by Mortell and Wraback clearly was knowledge imputed to PCN; because, by virtue of the litigation trust agreement, the Trust stands in the stead of PCN itself; and because there is nothing in a fair reading of the complaint that leads to a conclusion that KPMG actively participated in the fraud designed, engineered, and implemented by Mortell and Wraback, the imputation defense should be available to bar liability to the Trust.

---

outsiders, the fraud is imputed to the corporation and is an absolute defense to the corporation's action against its accounting firm for negligent failure to discover the fraud.").

## C.

The majority takes the position that KPMG is not entitled to dismissal at this stage because the Trust is entitled to additional discovery. That position is based on the generally correct principle that the imputation defense recognized in *Integrity* does not extend to "one who contributed to the misconduct." *Supra,* 240 *N.J.Super.* at 506, 573 *A.2d* 928. The question, however, is whether the complaint here can be read fairly to claim that KPMG "contributed to the misconduct" perpetrated by Mortell and Wraback, PCN's senior-most corporate officers. In order to fairly understand the extent of KPMG's obligations, which places in its rightful context any argument that KPMG "contributed" to Mortell's and Wraback's misconduct, one must address first what receives only a glancing reference in the majority's analysis: the scope of an auditor's engagement. *Ante,* 187 *N.J.* at 382–83, 901 *A.2d* at 888–89 (2006). Because that scope defines and determines the auditor's liability in respect of that engagement, the primacy of this exercise cannot be questioned and its minimal treatment by the majority is puzzling.

In general, New Jersey regulations governing the provision of auditing services by a licensed certified public accountant require that the auditor

> shall not permit [his/her] name to be associated with financial statements in such a manner as to imply that [he/she] is acting as an independent public accountant with respect to such financial statements unless [he/she] has complied with applicable generally accepted auditing standards (GAAS). Statements of Auditing Standards (SAS) issued by the American Institute of Certified Public Accountants, and other pronouncements having similar generally recognized authority, are considered to be interpretations of generally accepted auditing standards, and departures therefrom shall be justified by those who do not follow them.
> [*N.J.A.C.* 13:29-3.5.]

As those regulations acknowledge, an auditor's responsibilities are more specifically codified in and defined by the Statements on Auditing Standards issued by the Auditing Standards Board, "the senior technical body of the AICPA [American Institute of Certified Public Accountants] designated to issue pronouncements on auditing matters applicable to the preparation and issuance of

audit reports. . . ." American Institute of Certified Public Accountants, *Codification of Statements on Auditing Standards (including Statements on Standards for Attestation Engagements) Numbers 1 to 101 (as of January 1, 2005)*, at iii (*SAS*). On the whole, as *N.J.A.C.* 13:29-3.5 explicitly recognizes, the performance of an audit is defined by generally accepted auditing standards:

> An independent auditor plans, conducts, and reports the results of an audit in accordance with generally accepted auditing standards (GAAS). Auditing standards provide a measure of audit quality and the objectives to be achieved in an audit. Auditing procedures differ from auditing standards. Auditing procedures are acts that the auditor performs during the course of an audit to comply with auditing standards.
>
> [*SAS* at AU § 150.01.]

Although variously defined, the scope of the auditor's engagement—*what* the auditor is to do in an engagement *as opposed to how* it is to be done—is driven exclusively by the specific wishes of the client. As set forth in the AICPA's Attestation Standards (AT), audit engagements are grouped into four distinct general categories. In ascending order of detail, these are: compilations of prospective financial statements; review reports; examination or audit reports; and reports on agreed-upon procedures engagements. Because the scope of the services PCN purchased from KPMG defines KPMG's liability, an understanding of the differences among the available auditing services is crucial.

### 1. *Compilations.*

When performing a compilation of prospective financial statements, the auditor's engagement is limited to assembling projected financial statements, determining whether "the prospective financial statements with their summaries of significant assumptions and accounting policies . . . appear to be presented in conformity with AICPA presentation guidelines and are not obviously inappropriate," and issuing a compilation report to that effect. *SAS* at AT § 301.12. Significantly, "[a] compilation is not intended to provide assurance on the prospective financial statements or the assumptions underlying such statement." *Id.* at AT § 301.13. Instead, "[b]ecause of the limited nature of the practi-

tioner's procedures, a compilation does not provide assurance that the practitioner will become aware of significant matters that might be disclosed by more extensive procedures." *Ibid.*

2. *Review Reports.*

Review reports are at a level once removed from compilations. The distinguishing characteristics of a review report are that:

the practitioner's conclusion should state whether any information came to the practitioner's attention on the basis of the work performed that indicates that (a) the subject matter is not based on (or in conformity with) the criteria [established as relevant in consultation with the client] or (b) the assertion is not presented (or fairly stated) in all material respects based on the criteria.

[*Id.* at AT § 101.88.]

The language an auditor is to use in the presentation of a review report has been standardized. Although the examples provided by the AICPA vary depending on their subject matter,[10] the core language required for the issuance of a review report remains constant, expressly distinguishes between a review report and an examination report, and disavows any opinion on the subject matter. *See id.* at AT § 101.115. Because a review report expresses no opinion on the part of the auditor, a review report is "designed to provide a moderate level of assurance" and "the objective is to accumulate sufficient evidence to restrict attestation risk to a moderate level." *Id.* at AT § 101.55. In order "[t]o accomplish this, the types of procedures performed generally are limited to inquiries and analytical procedures (rather than also including search and verification procedures)." *Ibid.*

3. *Examinations or Audit Reports.*

In contrast, an examination or audit report requires a more detailed level of performance from the auditor. As noted by the AICPA,

---

[10] The AICPA distinguishes among review reports on a subject matter for general use, review reports on a subject matter that is the responsibility of a party other than the client, and review reports on an assertion. *See id.* at AT § 101.115, Examples 1, 2 and 3.

> [i]n an attest engagement designed to provide a high level of assurance (referred to as an examination), the practitioner's objective is to accumulate sufficient evidence to restrict attestation risk to a level that is, in the practitioner's professional judgment, appropriately low for the high level of assurance that may be imparted by his or her report. In such an engagement, a practitioner should select from all available procedures–that is, procedures that assess inherent and control risk and restrict detection risk–any combination that can restrict attestation risk to such an appropriately low level.
>
> [*Id.* at AT § 101.54.]

Unlike a review report, the language designated for use in an examination or audit includes the expression of the auditor's opinion based on statistically significant sampling techniques and the specific language in which that opinion is expressed as provided by the *SAS. See id.* at AT § 101.114.[11] The language of KPMG's audit opinion here tracks the language explicitly set forth in the *SAS.*

### 4. *Agreed-upon Procedures.*

Finally, the highest and most defined level of an auditor's services are agreed-upon procedures engagements, where

> a practitioner is engaged by a client to issue a report of findings based on specific procedures performed on subject matter. The client engages the practitioner to assist specified parties in evaluating subject matter or an assertion as a result of a need or needs of the specified parties. Because the specified parties require that findings be independently derived, the services of a practitioner are obtained to perform procedures and report his or her findings. The specified parties and the practitioner agree upon the procedures to be performed by the practitioner that the specified parties believe are appropriate. Because the needs of the specified parties may vary widely, the nature, timing, and extent of the agreed-upon procedures may vary as well; consequently, the specified parties assumed responsibility for the sufficiency of the procedures since they best understand their own

---

[11] The AICPA provides seven examples of examination or audit reports: a standard examination report on subject matter for general use; a standard examination report on an assertion for general use; an examination report for general use; an examination report on a subject matter; an examination report with a qualified opinion because conditions exist that, individually or in combination, result in one or more material misstatements or deviations from the criteria; an examination report that contains a disclaimer of opinion because of a scope restriction; and an examination report on subject matter that is the responsibility of a party other than the client. *See id.* at AT § 101.114, Examples 1 to 7.

needs. In an [agreed-upon procedures] engagement ... the practitioner does not perform an examination or a review ... and does not provide an opinion or negative assurance. Instead, the practitioner's report on agreed-upon procedures should be in the form of procedures and findings.

[*Id.* at AT § 201.08.]

Unlike other audit functions, agreed-upon procedures engagements are tailored to identify and examine areas as defined by, and in as much detail as specifically requested by, the client. Due to the limitations of an engagement that requests that the auditor perform an examination or audit report of a corporation's financial statements, requests that an auditor investigate whether financial statements are misstated due to fraud perforce fall squarely within the category of agreed-upon procedures. Because KPMG's liability must be defined by the scope of the engagement it entered into with PCN, the threshold question that must be addressed is what level of auditing services KPMG was engaged by PCN to perform.

### D.

Even the most cursory review of what PCN and KPMG agreed to in respect of KPMG's provision of auditing services to PCN makes clear that KPMG was not retained to prepare compilations or generate a review report. It is equally clear that KPMG was not engaged to provide the highest level of auditing services: agreed-upon procedures. Indisputably, KPMG was retained to provide garden-variety examination or audit report services. That is the yardstick against which KPMG's performance must be measured.

KPMG was engaged to perform an examination of PCN's financial statements for 1994, 1995, 1996, and 1997, the period of time when Mortell and Wraback, supported by other PCN senior accounting and operations officers, were engaged in their fraudulent scheme to artificially inflate PCN's revenues.[12] It is signifi-

---

[12] Although KPMG's audit responsibilities spanned PCN's 1994 through 1997 fiscal years, the complaints raised by the Trust deal exclusively with 1995 and 1996.

cant, and, in my view, ultimately dispositive, that KPMG was not retained to perform any agreed-upon procedures engagements concerning PCN's revenues or whether the same had been properly stated by PCN's management. KPMG's obligation, therefore, was limited: it was to opine whether the financial statements prepared by those PCN placed in positions of authority—Mortell, Wraback and their confederates—fairly presented, in all material respects, the financial condition of PCN.

However, because PCN designated Mortell and Wraback as the exclusive conduits through which KPMG could secure information to carry out its examination or audit engagement, KPMG's audit data came from a polluted source and produced similarly polluted results. Thus, the proper issue here is whether, in the context of an examination or audit of financial statements, a corporation injured by the wrongful acts of its own officers can recover from its auditors for failing to discover and expose the corporate officers' wrongdoing that caused the falsity in the financial statements in the first place.

In this context, the governing principle of law is, to me, obvious: no one should profit from a fraud he himself perpetrated, either directly or through his designated agents. If that principle is applied to the issue as presented, the result is equally obvious: the Trust's complaint against KPMG properly was dismissed by the trial court.

The respective duties of the corporation and its auditors are defined by the contractual relationship between a corporation and its auditors. That contractual relationship is defined in the engagement letter between the corporation and its auditors, as interpreted and supplemented by professional standards of the auditing profession. What the majority ultimately does is re-write the engagement between PCN and KPMG from an examination or audit report to an engagement for the agreed-upon procedures in respect of a revenues fraud audit. That is not what PCN requested or paid for, and it is also not what KPMG committed itself to do. In the end, the majority ignores the basis of the bargain

between PCN and KPMG and, instead, imposes its own view of the services an auditor is retained to perform. Thus, in the majority's view, it matters not whether PCN intentionally purchased a mid-level sedan from KPMG, as KPMG nevertheless was required to deliver a Rolls Royce simply because some of the passengers in the car later wanted to travel with greater comfort. These were sophisticated, experienced and knowledgeable parties: if what PCN wanted was a guarantee that its financial statements as prepared by its selected corporate agents were entirely without blemish, it should have bargained for, and paid for, appropriate agreed-upon procedures engagements instead of seeking to reform its examination or audit engagement agreement through litigation.

### III.

I also dissent from the majority's rejection of the thoughtful, reasoned and comprehensive opinion of the United States District Court for the District of New Jersey, which dismissed, for failure to state a claim upon which relief can be granted, an earlier almost identical complaint filed against KPMG in respect of the same claims raised in this case involving KPMG's audit work for PCN. *State of Wis. Inv. Bd. v. KPMG, LLP,* Civil Action No. 01–751 (DRD) (D.N.J. June 18, 2001). According to the majority, the claims in the matter before Judge Debevoise "were based on violations of Section 10(b) of the Securities and Exchange Act of 1934 and Section 11 of the Securities Act of 1933[, and t]his appeal, although grounded on similar facts, involves entirely different claims based on state law." *Ante,* 187 *N.J.* at 384, 901 *A.*2d at 890 (2006). For that reason, the majority concludes that "reference to that decision does not answer the question before this Court." *Ante,* 187 *N.J.* at 384, 901 *A.*2d at 890 (2006).

Although the federal court matter involved securities fraud claims, and the claims pending before this Court allege common law causes of action for negligence and deceit, that is, at most, a distinction without a difference. As the Supreme Court of the United States recently noted, private federal securities fraud

actions "resemble[ ], but [are] not identical to, common-law tort actions for deceit and misrepresentation." *Dura Pharm., Inc. v. Broudo*, 544 *U.S.* 336, 341, 125 *S.Ct.* 1627, 1631, 161 *L.Ed.*2d 577, 584 (2005). Parallels predominate between this case and the one determined by the federal court; indeed, the complaints in the two cases are virtually identical.[13]

The federal court's reasoning is compelling and presents lessons we ignore at our own peril. The court explained that

courts have consistently found incredible allegations of an auditor's purported participation in a client's fraud. *See, e.g., Melder v. Morris,* 27 *F.*3d 1097, 1102 (5th Cir.1994) (finding it "extremely unlikely" that auditor would risk professional reputation by conducting fraudulent auditing work); *DiLeo v. Ernst & Young,* 901 *F.*2d 624, 629 (7th Cir.1990) (finding it "irrational" that auditor would have risked reputation for honesty by participating in fraud for client); *Reiger v. Price Waterhouse Coopers LLP,* 117 *F.Supp.*2d 1003, 1007 (S.D.Cal.2000) (stating that independent accountants "will rarely, if ever, have any rational economic incentive to participate in its client's fraud.... The accountant's success depends on maintaining a reputation for honesty and integrity, requiring a plaintiff to overcome the irrational inference that the accountant would risk its professional reputation to participate in the fraud of a single client.").

Additionally, courts have found the notion that defendants were motivated by the prospect of fees similarly unavailing. *See Vogel v. Sens [Sands] Bros. & Co.,* 126 *F.Supp.*2d 730, 739 (S.D.N.Y.2001) (finding allegation that defendant sought greater fees insufficient to show motive); *In re SmarTalk Teleservices, Inc. Sec. Litig.,* 124 *F.Supp.*2d 505, 518 (S.D.Ohio 2000) (finding allegation that defendant sought to maintain fees insufficient to infer scienter); *Duncan v. Pencer,* No. 94 Civ. 0321, 1996 WL 19043, at *9–10 (S.D.N.Y. Jan. 18, 1996) (same).

The case presently before us has been litigated and dismissed in the federal court in and for this State; it should meet an equal fate here.

## IV.

Other public policy considerations caution against the result the majority reaches. Save for a passing reference, *ante,* 187 *N.J.* at

---

13 Tellingly, the only substantive difference between the two complaints lies in the fact that one was filed in federal court, charging federal claims, while the other was filed in state court and pled state common law claims. The facts as pled here in respect of the negligence claims are no different from, and add nothing to, those pled in the federal complaint.

380, 901 *A.*2d at 887 (2006), the majority ignores the import of the Legislature's limitation of liability on the actions of accountants for third-party claims. *See N.J.S.A.* 2A:53A–25b. The salutary basis for the legislative limitation of accountant liability is to cabin in claims against accountants and auditors. Yet, despite that limitation, the majority expands the liability of auditors to the point where they become guarantors of their audit results regardless of the level of the engagement entered into with the client.[14] The majority's result will advance the concerns echoed by amici that the providers of auditing services in New Jersey will become an ever-shrinking pool and that the cost of those services will increase exponentially as a function of increasing liability.

Those points were made clearly and succinctly by amici curiae the American Institute of Certified Public Accountants and the New Jersey Society of Certified Public Accountants. Highlighting that "[a]n auditor's role in the accurate presentation of a client's financial statement is limited, and most importantly, secondary to that of the client[,]" they assert that we "should not allow companies that have engaged in fraud to recover damages from their auditors based purely on a showing of negligence because it results in a misallocation of responsibility between auditor and client for the preparation of financial statements." They also pragmatically point out that "[i]n addition to causing a misallocation of liability, allowing a company's management to shift the consequences of its own executive's fraud to its accountants where the auditor is not alleged to have assisted in that fraud may diminish management's incentive to exercise due care in its own

---

[14] Only cold comfort can be derived from the majority's conclusion that KPMG can simply proceed with discovery and that, once discovery is complete, "KPMG may move for summary judgment if the evidence demonstrates that no rational factfinder could conclude that the audits were negligently conducted." *Ante,* 187 *N.J.* at 385, 901 *A.*2d at 890 (2006) (internal quotation marks and citation omitted). That conclusion dismisses the great costs that attend the defense of actions such as this one and merely sanctions what is referred to as nothing more than legal extortion: seeking a settlement simply because the costs of defense are prohibitive.

responsibilities." Third, they explain that jettisoning the imputation defense is not the *sine qua non* of insuring the continued quality of audit as "there already are numerous common-law, statutory, regulatory and professional standards requiring accountants to acquit themselves professionally and to perform audits competently and honestly." And, finally, applying plain common sense, they foretell that the rule adopted by the majority "will further contribute to the unending litigation explosion" to which accountants have been subject in recent years, and that "[a]n increase in litigation will result in an increase in liability insurance protection for auditors, a cost that will be passed on to the clients in the form of more expensive auditing services." That result will have an unintended consequence: "while large clients may find themselves paying increased audit fees reflecting higher prices for malpractice insurance, small clients may not only pay increased fees, but may have trouble finding auditors at all."

Nothing in the majority's opinion fairly addresses these self-evident points. That is because there simply is nothing that can be stated in rebuttal to those logical and understandable points. In these circumstances, the Legislature may wish to review the consequences of the majority's decision and correct the imbalance it creates in the relationship between an auditor and his client.

## V.

In the context of this suit, a suit brought by and on behalf of the shareholders of a bankrupt entity not as a shareholders' derivative action but as one clothed as a trust, we must address the scope of the unprecedented remedy afforded by the majority. In similar circumstances, this Court recently denied relief to shareholders who also attempted a feint around the salutary and long-standing restrictions against shareholder actions. *E. Dickerson & Son, Inc. v. Ernst & Young, LLP,* 179 *N.J.* 500, 846 *A.*2d 1237 (2004). Specifically, this Court peremptorily held that "this is [not] a stockholders' derivative action for the benefit of the accountants' 'client,' Twin County. *See In re PSE & G Shareholder Litig.,* 173

*N.J.* 258, 801 *A.*2d 295 (2002). This is an action for the benefits of the plaintiff corporations and their shareholders." *Id.* at 506, 846 *A.*2d 1237. Thus, by allowing shareholders to proceed against the corporation's auditors merely by using the ruse of a trust, the majority does needless violence to our jurisprudence that both respects the separate viability of corporate entities and limits a shareholder's power to act on the corporation's behalf.

Moreover, the remedy fashioned by the majority is fraught with practical impossibilities. Without the benefit of any authority, the majority concludes that, because "we should not punish the many for the faults of the few[,]" *ante,* 187 *N.J.* at 377, 901 *A.*2d at 885 (2006), "imputation may be asserted against those shareholders who engaged in the fraud[, . . .] those who, by way of their role in the company, should have been aware of the fraud[, and those] shareholders [who], by virtue of their ownership of a large portion of stock, have the ability to conduct oversight of the firm's operations." *Ante,* 187 *N.J.* at 378, 901 *A.*2d at 886 (2006).

One is entirely at a loss to understand how the majority's construct can be applied. For example, if a corporation has 1,000 shareholders, must the trial court hold 1,000 separate mini-trials to determine whether each specific shareholder is barred from recovery because he either "engaged in the fraud[, . . .] should have been aware of the fraud[, or who], by virtue of their ownership of a large portion of stock, ha[d] the ability to conduct oversight of the firm's operations[?]" What if the corporation has not 1,000 shareholders, but 5,000,000? Assuming, as one must, that plaintiffs in this new construct still have the burden of proving their entitlement to recovery, must each plaintiff appear and prove himself free of taint? Will the majority ultimately conclude that, contrary to basic tenets of our jurisprudence, the burden should fall on the party asserting the imputation bar to prove it? If so, how can they, given that the proofs of complicity will lie solely with the plaintiffs and are readily susceptible to spoliation? In the end, the parsing-out required by the majority's

notion of who can recover under what circumstances is patently impracticable.

Finally, it must be recognized that the majority effects a fundamental transformation of the imputation defense. As a result of the majority's construct, the imputation defense ceases to be a defense to liability and becomes, instead, an item in mitigation of damages. Thus, instead of providing a bulwark against claims by vicarious wrongdoers, the now-transformed imputation defense is relegated to the piecemeal diminution of the damages alleged. Having put an untimely end to the imputation defense, the least the majority can do is to give it a proper burial instead of sentencing it to some jurisprudential limbo.

## VI.

In the end, the principles we should be embracing are simple. First, we should reaffirm the core principle that an actor is liable for his actions. Second, we should ratify once more our agency principles and hold that a principal is vicariously liable for the acts of his chosen agent. Third, we should give breath to the bedrock concept that no one should profit from their wrongdoing. Finally, we should return to one of the fundamental principles underpinning our jurisprudence that bars the culpable from recovery.

The majority wishes to penalize KPMG because it did not uncover soon enough an elaborate ruse intentionally planned and deliberately executed by PCN's highest level executives, the very persons to whom PCN gave the gatekeeper responsibility for the information KPMG needed to ferret out their fraud. PCN's common shareholders—the defined beneficiaries of the Trust [15]—bear the same responsibility for corporate misdeeds as the corpo-

---

[15] The trust agreement provides that the beneficiaries of the Trust are "all holders of Allowed Class 7B Equity Interests." Under PCN's bankruptcy plan of reorganization, those who represent the "Class 7B Equity Interests" are those who held PCN's common stock; the holders of PCN's preferred stock were designated in the reorganization plan as "Class 5 Preferred Stock Interests."

ration in whose shoes they stand. For those reasons, I see no basis to depart from long-standing precedent and, thus, would affirm yet again that "as between two innocent parties, public policy requires that the principal must bear the loss occasioned by the act of his servant." *Stanley v. Chamberlin,* 39 *N.J.L.* 565, 567 (Sup.Ct.1877). In the circumstances presented here, that principle requires that KPMG be allowed the protection of the imputation defense at the motion to dismiss stage and, because additional discovery will never cure the fundamental ills that afflict plaintiff's complaint, KPMG should not have to abide the summary judgment stage.

Therefore, I respectfully dissent.

*For Affirmance as Modified/Remand*—Chief Justice PORITZ, and Justices LONG, ZAZZALI, ALBIN and WALLACE—5.

*Dissenting*—Justices LaVECCHIA and RIVERA-SOTO—2.